## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-03630-NYW

RONALD KELLY, and
SHELLI KELLY,

      Plaintiffs,

v.

UNITED STATES OF AMERICA,

      Defendant.

---

## DEFENDANT'S MOTION TO PARTIALLY EXCLUDE TESTIMONY AND STRIKE EXPERT DISCLOSURES OF DR. WILLIAM ENG LEE, DR. STEVEN SIDES, AND DR. KELLY SANDERFORD

---

Pursuant to Federal Rule of Evidence 702 and Federal Rules of Civil Procedure 26 and 37, Defendant moves for an order (1) excluding portions of the proposed testimony of Plaintiffs' retained expert, Dr. William Eng Lee, and Plaintiff Ronald Kelly's treating physicians, Dr. Steven Sides and Dr. Kelly Sanderford, and (2) striking corresponding portions of Plaintiffs' expert disclosures. These opinions, enumerated more specifically below, are starkly unsupported by adequate data and do not reflect the reliable application of scientific principles sufficient for admission. *See* Fed. R. Evid. 702(b)-(d); *see also* Fed. R. Evid. 703 (an expert may base an opinion on "facts or data in the case that the expert has been made aware of or personally observed"). Moreover, Plaintiffs' disclosures failed to comply with Federal Rule of Civil Procedure 26(a)(2), and those deficiencies were not substantially justified or harmless.

In this case, Plaintiffs claim that Mr. Kelly experienced abnormal bleeding and poor wound healing in the weeks following a June 20, 2017 knee replacement surgery by Dr.

1

Sanderford, and that those symptoms were caused by a post-operative "bridging" regimen involving the use of anticoagulant medications managed by Mr. Kelly's primary care providers at Sunrise Community Health clinics ("Sunrise").  Plaintiffs' retained expert, Dr. Lee, offers opinions as to how the Sunrise providers' actions in managing Mr. Kelly's anticoagulant bridging therapy allegedly violated applicable standards of care.  Dr. Sides and Dr. Sanderford—each of whom performed knee surgeries on Mr. Kelly—opine that no "member of the 'orthopedic team'" was negligent or caused injury to Mr. Kelly.

None of these proffered experts has reviewed any medical records from Sunrise or the Kellys' depositions.  In Dr. Lee's case, he has not reviewed any of Mr. Kelly's medical records at all.  These experts have testified that they were unaware of critical information regarding the sequencing of Mr. Kelly's symptoms and care, including the fact that Mr. Kelly was bleeding profusely later on the day of his first surgery—*i.e.*, before the accused anticoagulant bridging even began.  These experts do not identify particular methods used to reach their conclusions or how they applied scientific principles to the facts, including by performing differential medical diagnoses.  Their opinions do not meet the standards outlined in Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593-94 (1993).

In addition, Plaintiffs' expert disclosures for the two treating physicians—Drs. Sanderford and Sides—failed to comply with the basic requirements of Federal Rule of Civil Procedure 26(a)(2).  Plaintiffs' disclosures indicate that Plaintiffs may call these providers to offer testimony on causation and defensive issues going well beyond the scope of their own treatment of Mr. Kelly.  To the extent Plaintiffs seek to elicit these opinions, their expert disclosures do not comply with the requirements of Rule 26(a)(2)(B) or even the more modest requirements of Rule 26(a)(2)(C).  The relevant portions should be stricken pursuant to Federal

Rule of Civil Procedure 37(c)(1).[1]

**FACTUAL AND PROCEDURAL BACKGROUND**

The Complaint pleads a claim for negligence on behalf of Ronald Kelly, *see* ECF No. 1 ¶¶ 35-41, and a claim for loss of consortium for Shelli Kelly, *see id.* ¶¶ 42-49.  These claims, brought under the Federal Tort Claims Act ("FTCA"), allege that negligent treatment was provided to Mr. Kelly in June-July 2017 by six different primary care providers at Sunrise.  *Id.* ¶¶ 4, 9, 11; Ans. ¶¶ 4, 9, 11, ECF No. 14.

### I.      Mr. Kelly's Medical History

Mr. Kelly's relevant medical history is summarized here.

As pertinent to the anticoagulation treatment challenged in this case, Mr. Kelly had an aortic valve replacement in 1991.  Compl. ¶ 15; R. Kelly Dep. (Ex. A) 16:4-6.  Since that time, he has been taking the daily anticoagulant medication Coumadin (warfarin)[2] to prevent blood clotting.  Compl. ¶ 16; R. Kelly Dep. (Ex. A) 15:23-16:3.  He also has taken regular international normalized ratio ("INR") blood tests, which monitor his levels of anticoagulation.  R. Kelly Dep. (Ex. A) 16:22-17:19; Exp. Rpt. of Dr. Toby C. Trujillo (Ex. B) at 5.

Based on those INR results, Mr. Kelly's Coumadin dosage can be continued, decreased, or increased in an effort to keep his INR in a "goal" (or "therapeutic") range of 2.5-3.5, which was set by his cardiologist.  R. Kelly Dep. (Ex. A) 18:16-22; Trujillo Rpt. (Ex. B) at 5.  As both

---

[1] Pursuant to D.C.COLO.LCivR. 7.1(a), undersigned counsel certifies that she conferred with counsel for Plaintiffs regarding this motion by telephone on March 23, 2021.  Plaintiffs oppose the relief requested herein.  In addition, counsel conferred on any potential confidentiality considerations related to the public filing of this motion and its exhibits, in view of their references to Mr. Kelly's medical conditions.  Counsel for Plaintiffs advised that Plaintiffs were not requesting for any such materials to be submitted as restricted filings or under seal.

[2] The parties have referred to "Coumadin," a branded product, interchangeably with "warfarin," the generic equivalent, in depositions and other case documents.  *See, e.g.*, Compl. ¶ 16.

parties' standard of care experts agree, a low or "subtherapeutic" INR is associated with higher risks of clotting, while a high or "supratherapeutic" INR is associated with comparatively increased risks of bleeding.  Trujillo Rpt. (Ex. B) at 8-9; Lee Dep. (Ex. C) 60:9-17.

Mr. Kelly started receiving primary care services at Sunrise in approximately 2008 and was seeing Dr. Davis as his primary care doctor by the relevant period in 2017.  R. Kelly Dep. (Ex. A) 37:19-38:3, 39:12-18.  In general, Mr. Kelly's INR's results were "difficult to control with his anticoagulation for a lot of different reasons," including diet adherence and missed appointments.  Davis Dep. (Ex. D) 52:4-14, 98:7-24; *see also, e.g.*, R. Kelly Dep. (Ex. A) 87:20-88:3 (recalling an INR as high as 8 prior to July 2017).  Nonetheless, Mr. Kelly's anticoagulation in the years leading up to 2017 was reasonably controlled, involving weekly total doses of Coumadin that did not differ drastically.  Trujillo Rpt. (Ex. B) at 5 (reviewing records).

In June 2017, Mr. Kelly was preparing to undergo a right total knee replacement surgery. Compl. ¶ 14; Ans. ¶ 14.  In view of his artificial heart valve and attendant risks of blood clotting, an anticoagulant bridging plan was put in place for Mr. Kelly, which called for him to stop taking Coumadin several days prior to surgery; take a short-acting medication, Lovenox (enoxaparin), in the days leading up to surgery; restart Coumadin and Lovenox post-operatively; and discontinue Lovenox once his INR results reached a "therapeutic" level over 2.5.  Trujillo Rpt. (Ex. B) at 6; USA SUNRISE 000025-000027 (Ex. E);[3] *see also* Compl. ¶¶ 20-21; Sides Dep. (Ex. F) 17:22-18:16 (explaining that it is "standard operating procedure" to "restart the Lovenox postoperatively until the I[N]R is back to desired range").  Mr. Kelly's cardiologists assisted Mr. Kelly to "come off of his therapy" with Coumadin "prior to the procedure" and

---

[3] Cited medical records from a given healthcare entity are identified in text by specific Bates number and attached hereto as one exhibit.  For example, all cited Sunrise records are identified by Bates number, and the excerpted records are attached together as Exhibit E.

provided "recommendations on when to restart it."  Davis Dep. (Ex. D) 36:4-37:11.

On June 20, 2017, Mr. Kelly underwent his initial right total knee replacement surgery. Compl. ¶ 23; Ans. ¶ 23.  The surgery was performed by Dr. Kelly Sanderford, R. Kelly Dep. (Ex. A) 46:12-14, who is a friend of the Kelly family, S. Kelly Dep. (Ex. G) 96:19-97:14.

While Mr. Kelly was inpatient for his surgery at the hospital (North Colorado Medical Center), his bridge therapy was managed by the hospital staff, not the Sunrise providers.  Davis Dep. (Ex. D) 38:2-9; *see also* Sanderford Dep. (Ex. H) 48:15-22 (explaining that "when a patient is still inpatient at the hospital following surgery," their anticoagulant medications are "being managed at that point" by "the hospital staff," and "while [Mr. Kelly] was in the hospital, it would not have been his primary care providers").  His INR was 1.0—*i.e.*, subtherapeutic—on the day of surgery.  USA NCMC 000936 (Ex. H).

Unfortunately, the surgery was not successful—and led to near immediate bleeding.  As the Kellys described in detail at their depositions, Mr. Kelly walked down the hospital hallway later the same day and "had blood running out of the bandage" on his knee.  R. Kelly Dep. (Ex. A) 46:15-47:2.  "Blood was dripping on the floor."  S. Kelly Dep. (Ex. G) 39:17-41:11.  After Mr. Kelly's bandage was unwrapped, it was discovered that he had discharged a "blood clot the size of my hand," prompting two nurses to quip that Mr. Kelly "just grew a liver."  R. Kelly Dep. (Ex. A) 46:15-49:9.  The nurses threw away the clot, put on a new dressing, and, as far as the Kellys are aware, did not report the clot to anyone.  *Id.* 47:20-48:11; S. Kelly Dep. (Ex. G) 42:10-43:25, 45:8-46:9.

Mr. Kelly was discharged from the hospital the next day, June 21, 2017.  R. Kelly Dep. (Ex. A) 49:10-13.  His INR on the day of discharge remained low, at 1.1.  USA NCMC 000936 (Ex. H).  Nonetheless, when he got home, his knee still was bleeding.  R. Kelly Dep. (Ex. A)

49:22-25.  The Kellys repeatedly reached out to Dr. Sanderford's office at Banner Health over the next two weeks to report concerning symptoms regarding Mr. Kelly's knee, including "drainage," "oozing," "swelling," "very extensive bruising," abnormal "coloration," and "redness."  S. Kelly Dep. (Ex. G) 58:20-61:25, 64:7-65:8, 65:14-66:11.

During the same period, Mr. Kelly had several INR tests done at Sunrise,[4] all of which showed results below his goal anticoagulation range.  They showed: on June 23, 2017, an INR of 1.3, USA SUNRISE 000040-000041; on June 26, 2017, an INR of 1.6, USA SUNRISE 000042-000046; on June 28, 2017, an INR of 1.8, USA SUNRISE 000053-000054; on June 30, 2017, an INR of 1.8, USA SUNRISE 000055-000056 (Ex. E).  *See also* Trujillo Rpt. (Ex. B) at 6-7 (reviewing records).  At the June 30, 2017 appointment, Dr. Davis slightly increased Mr. Kelly's Coumadin dose and scheduled him for an INR test in one week, given that his INR had remained around 1.8 over three days and "it would take a week to actually have the different doses realized by the patient."  Davis Dep. (Ex. D) 66:25-68:4; USA SUNRISE 000055-000056 (Ex. E).

Notwithstanding the Kellys' calls, Dr. Sanderford's office did not have Mr. Kelly come in for a follow-up appointment until July 5, 2017, approximately two weeks out from Mr. Kelly's surgery.  USA NCMC ORTHO 000008-000010 (Ex. I).  At that appointment, Physician Assistant ("PA") Michelle Remley and Dr. Sanderford examined Mr. Kelly and observed that his surgical wound still was "open" under the bandage.  Sanderford Dep. (Ex. J) 20:21-23:23; Remley Dep. (Ex. K) 21:23-23:23 (she also observed "old, bloody, dark drainage" from Mr. Kelly's knee during the appointment).  To their awareness, no one at the orthopedic office had ever told Mr. Kelly to limit flexion of his knee prior to that appointment.  Sanderford Dep. (Ex.

---

[4] Such appointments often involved having the "lab performed" without a physical examination. R. Kelly Dep. (Ex. A) 75:18-76:8; Davis Dep. (Ex. D) 39:16-40:14.

J) 22:2-6; Remley Dep. (Ex. K) 23:15-17.  "Since his incision was still open and he had a large hemoarthrosis," *i.e.*, bleeding in his joint, Dr. Sanderford and PA Remley prescribed him the antibiotic clindamycin.  Remley Dep. (Ex. K) 24:12-25:6; *see also* USA NCMC ORTHO 000008-000010 (Ex. I).  Neither of them conveyed concerns about Mr. Kelly's wound drainage to his Sunrise providers.  Sanderford Dep. (Ex. J) 22:14-18; Remley Dep. (Ex. K) 23:24-24:11.

On July 7, 2017, Mr. Kelly had an INR test at Sunrise with a result of 3.7, slightly above the goal range of 2.5-3.5.  USA SUNRISE 000062-000063 (Ex. E); Trujillo Rpt. (Ex. B) at 7.  Dr. Filipovitz slightly decreased Mr. Kelly's Coumadin dose and instructed him to discontinue Lovenox, as his INR was now "slightly supratherapeutic."  Filipovitz Dep. (Ex. L) 92:11-94:23; *see also* USA SUNRISE 000062-000063 (Ex. E); Trujillo Rpt. (Ex. B) at 7.

On July 9, 2017, after getting out of the shower, Mr. Kelly discovered that there was "draining down my leg" from his knee.  R. Kelly Dep. (Ex. A) 65:13-17.  The Kellys again contacted Dr. Sanderford's office.  S. Kelly Dep. (Ex. G) 71:22-72:5.

Mr. Kelly went in for a follow-up appointment at Dr. Sanderford's practice the next day, July 10, 2017.  USA NCMC ORTHO 000005-000007 (Ex. I).  PA Remley observed that Mr. Kelly's knee was "more warm" and felt "something needed to be done and cultures done so that we could hopefully prevent other issues."  Remley Dep. (Ex. K) 29:23-31:8.  Dr. Sanderford was on vacation, so Dr. Sides, his associate at Banner Health, saw Mr. Kelly during the appointment.  Sanderford Dep. (Ex. J) 26:5-16.  Dr. Sides observed that the surgical wound "was not in continuity at that point, which it should have been by then."  Sides Dep. (Ex. F) 11:24-12:5.

Mr. Kelly also had his INR checked at Sunrise the same day, July 10, 2017.  It showed a result of 2.8, right within his 2.5-3.5 goal range for anticoagulation treatment.  USA SUNRISE 000064-000065 (Ex. E); *see also* Trujillo Rpt. (Ex. B) at 7.

Recognizing that things were "not going well" with Mr. Kelly's knee and the urgent "need to reverse course," Dr. Sides performed an irrigation and debridement ("I&D") and wound closure surgery for Mr. Kelly the next day, July 11, 2017.  Sides Dep. (Ex. F) 12:13-13:7.  While he was in the hospital, Mr. Kelly had the following INR results, all still below his goal range: on July 11, 2017, an INR of 2.2; on July 12, 2017, an INR of 2.0; on July 13, 2017, an INR of 2.3.  USA NCMC 001359 (Ex. H); *see also* Trujillo Rpt. (Ex. B) at 7.  Mr. Kelly was placed back on Lovenox by providers at the hospital, not Sunrise.  Filipovitz Dep. (Ex. L) 103:2-14; *see also* Trujillo Rpt. (Ex. B) at 7; Sides Dep. (Ex. F) 37:12-38:17.

After being discharged on July 13, 2017, Mr. Kelly had an INR test at Sunrise the next day, July 14, 2017.  It was slightly supratherapeutic at 3.8, so Dr. Filipovitz again instructed him to discontinue Lovenox and slightly reduced his Coumadin dosage.  USA SUNRISE 000066-000067 (Ex. E); Filipovitz Dep. (Ex. L) 103:15-21; *see also* Trujillo Rpt. (Ex. B) at 7

Bacterial cultures obtained during the I&D surgery came back revealing infections with *e. coli* and two *staphylococcus* organisms.  USA NCMC 003750-003754 (Ex. H); Exp. Rpt. of Dr. Keith B. Armitage (Ex. M) at 5; Exp. Rpt. of Dr. Richard D. Scott (Ex. N) at 3.  The infection was dire.  On July 15, 2017, the intravenous antibiotics Levaquin and daptomycin were given to Mr. Kelly at the direction of Dr. Ronald Quenzer at the hospital.  USA NCMC 001572-001574 (Ex. H); S. Kelly Dep. (Ex. G) 86:20-87:10.

By the next day, July 16, 2017, Mr. Kelly was "bleeding profusely down my leg, into my sock, into my shoe."  R. Kelly Dep. (Ex. A) 83:22-84:4.  He was admitted to the emergency room, the medical records from which reflect a high INR of 7.7 and concern that it was "possibly due to abx [antibiotic] interaction."  USA SUNRISE 000068-000081 (Ex. E).  As Dr. Lee has explained, "Levaquin, one of the antibiotics given to Mr. Kelly, is especially well-known to

increase INR levels and thus increase the risk of normal and excessive bleeding;" indeed, "all antibiotics can have a significant impact on Coumadin levels," including clindamycin.  Lee Dep. (Ex. C) 151:17-152:19.

Mr. Kelly thereafter underwent a series of corrective surgeries.  On July 19, 2017, Dr. Sanderford removed his prosthetic knee implant.  Compl. ¶ 31; Ans. ¶ 31; R. Kelly Dep. (Ex. A) 89:12-19.  On October 21, 2017, Mr. Kelly underwent an unsuccessful surgery by Dr. Kirk Kindsfater, at a different orthopedic practice, in an attempt to reimplant his knee hardware.  Compl. ¶ 32; Ans. ¶ 32; R. Kelly Dep. (Ex. A) 99:18-101:2; S. Kelly Dep. (Ex. G) 103:24-104:6.  On November 6, 2017, Dr. Kindsfater finally was able to reimplant it.  Compl. ¶ 33; Ans. ¶ 33; R. Kelly Dep. (Ex. A) 101:3-13; S. Kelly Dep. (Ex. G) 103:24-104:6.  Mr. Kelly alleges ongoing "physical disability" related to his knee.  Compl. ¶ 34.

## II.      Plaintiffs' Claims

Against the foregoing factual backdrop, Plaintiffs' Complaint blames for Mr. Kelly's injuries not his orthopedic or hospital providers—whom Plaintiffs did not sue within the statute of limitations period[5]—but his primary care providers at Sunrise, for allegedly "fail[ing] to appropriately manage Plaintiff Ronald Kelly's bridge therapy" following his initial total knee replacement surgery of June 20, 2017 and his I&D surgery of July 11, 2017.  *Id.* ¶¶ 26, 29.

Plaintiffs' negligence claim relies on a complex chain of causal inferences.  First, they allege that the Sunrise providers failed to conduct "sufficiently frequent" post-operative appointments and INR tests.  *Id.* ¶ 39.  Second—apparently theorizing that additional INR

---

[5] Defendant filed a Designation of Non-Parties at Fault pursuant to C.R.S. § 13-21-111.5, naming Dr. Sanderford, PA Remley, and Dr. Quenzer as negligent third parties who caused or contributed to Mr. Kelly's injuries.  ECF No. 32.  Plaintiffs have attempted to defend those providers' care, presumably to reduce any findings of proportional liability as to which Plaintiffs can no longer recover damages.

checks would have shown (unspecified) results prompting (unspecified) dose changes—Plaintiffs allege that the Sunrise providers failed to "make appropriate and timely dose adjustments of Coumadin and Lovenox." *Id.* Third, Plaintiffs allege that "as a result" of these omissions, Mr. Kelly "suffered abnormal and excessive bleeding and a failure of his surgical wound to heal." *Id.* ¶¶ 26, 29.  Fourth, they allege that Mr. Kelly had to undergo his corrective knee surgeries "[d]ue to the continued excess bleeding, failure to heal, and infection" that he experienced. *Id.* ¶¶ 31-33.  Fifth, they allege that Mr. Kelly suffers ongoing "physical disability and related injuries" due to these "medical events and treatment." *Id.* ¶ 34.

Dr. Lee's standard of care opinions, challenged below, are relevant to the first and second steps of the foregoing chain: in what way did the Sunrise providers fail to conduct "sufficiently frequent" INR tests, and what "appropriate and timely dose adjustments" should they have made?  Meanwhile, Dr. Lee, Dr. Sanderford, and Dr. Sides' causation opinions, challenged below, are relevant to the third and fourth steps of the chain: absent the Sunrise providers' alleged omissions, would Mr. Kelly have suffered abnormal and excessive bleeding and a failure of his wound to heal, necessitating corrective surgeries?

### III.    Plaintiffs' Expert Opinions

Pursuant to the Court's Scheduling Order, the parties exchanged initial expert disclosures on November 18, 2020.  Defendant has endeavored to delineate below the nature and contents of the specific opinions challenged for purposes of the instant motion.[6]

---

[6] In respect for the parties' and the Court's time, Defendant has attempted to focus this motion on what it believes are dispositive concerns presented by Plaintiffs' expert disclosures, without conceding that they otherwise satisfy the reliability and procedural standards addressed herein. In addition, in view of some courts' practice standards requiring specific identification of each opinion a moving party seeks to exclude, Defendant has compiled a list of the written opinions challenged herein. *See, e.g.*, Prac. Stds. of Chief Judge Phillip A. Brimmer, Std. III.G.

### a. Dr. Lee's Challenged Opinions

Plaintiffs disclosed Dr. Lee, a physician associated with National Jewish Health Northern Hematology Oncology, as their only retained expert witness under Federal Rule of Civil Procedure 26(a)(2)(B).  Pls. F.R.C.P. 26(a)(2) Exp. Disc. (Ex. O) ("Plaintiff's Initial Disclosures") at 1-2.  Plaintiffs' disclosure document attaches as Exs. A-B thereto a document entitled "William Eng Lee, M.D." and Dr. Lee's CV (together, Ex. P hereto), which purports to set out Dr. Lee's opinions on "the issues of negligence, causation and damages."

Dr. Lee offers the following opinions, challenged below, regarding the Sunrise providers' alleged breaches of the standard of care with respect to: (1) INR testing (which he believes should have been conducted "daily on post-operative days 4 through 10" and otherwise until therapeutic INR results were shown for "two consecutive days"), and (2) anticoagulant dose adjustments (what adjustments Dr. Lee believes were warranted is never specified) (collectively, the "Lee Breach Opinions"):[7]

- "Dr. Lee will testify that the recommendations of the American College of Chest Physicians indicate that during bridge therapy, INRs should be checked on post-operative day 2, and then daily on post-operative days 4 through 10.  Dr. Lee will indicate that most patients will reach a therapeutic range before post-operative day 10.  If a patient has not reached a therapeutic range in his INRs before post-operative day 10, this would require additional frequent monitoring of INR results from post-operative day 10 forward."  Lee Rpt. (Ex. P) at 4.

- "Dr. Lee will testify that the providers at SCH failed to follow the recommendations of the American College of Chest Physicians by failing to obtain INR results daily from

---

[7] Similar opinions are included in "Plaintiffs' Rebuttal F.R.C.P. 26(a)(2) Expert Disclosures" (Ex. S) ("Plaintiffs' Rebuttal Disclosures"), which were not signed by any of the referenced witnesses.  In particular: "Dr. Lee will rebut Toby Trujillo's opinions that the Sunrise Community Health providers were not negligent and that their negligence was not a cause of injuries and damages to Ronald Kelly.  Specifically, Dr. Lee will testify that the providers at Sunrise Community Health did not conduct sufficiently frequent INR tests and did not appropriately manage Ronald Kelly's anticoagulation medications."  Pls.' Rebuttal Disc. (Ex. S) at 1-2.  These "rebuttal" opinions should be excluded for the same reasons briefed as to the opinions in the initial disclosures.

June 23 to June 30.  He will testify that this was negligent and below the standards of care.  He will also explain that therapeutic INR results should be shown for two consecutive days, and that the failure to obtain daily INR levels would make it impossible for the providers to obtain therapeutic INR levels for two consecutive days." *Id.* at 5.

- "Dr. Lee will testify that on June 30, 2017 Dr. Samuel Davis increased the Coumadin dose for Mr. Kelly and instructed Mr. Kelly to return for a follow-up INR test in one week.  Dr. Lee will explain that the instruction to wait one week to obtain an INR result was contrary to the recommendations of the American College of Chest Physicians.  Dr. Lee will testify that Dr. Davis' failure to obtain INR testing between June 30 and July 7 was negligent and below the standards of care for a physician under the circumstances." *Id.* at 5-6.

- "Dr. Lee will explain that the failure to perform sufficiently frequent INR tests caused Mr. Kelly to remain on Lovenox through July 7, and that it is unreasonable and below the standards of care to have a patient on Lovenox and Coumadin for that length of time under these circumstances." *Id.* at 6.

- As to the July 7, 2017 appointment: "Dr. Lee will explain that Dr. Filipovitz's failure to schedule the next INR test sooner than one week was contrary to the recommendations of the American College of Chest Physicians and was negligent and below the standards of care." *Id.* at 6.

- As to the July 14, 2017 appointment: "Dr. Lee will explain that Dr. Filipovitz's failure to schedule the next INR test sooner than 4 days was contrary to the recommendations of the American College of Chest Physicians.  Dr. Lee will testify that Dr. Filipovitz's failure to order INR testing sooner than 4 days following July 14 was negligent and below the standards of care for a physician under the circumstances." *Id.* at 7.

- "Dr. Lee will indicate that Mr. Kelly's INR was not checked on July 15, 2017 even though his INR the previous day had been supratherapeutic and that his medication doses had been adjusted.  Dr. Lee will testify that this was negligent treatment by the SCH providers and below the standards of care for physicians under similar circumstances." *Id.* at 8.

- "Dr. Lee will testify that Dr. Davis and Dr. Filipovitz did not perform sufficiently frequent INR testing and did not make appropriate and timely dose adjustments to the anticoagulation medications." *Id.* at 9.

Dr. Lee's report also includes the following causation opinions, challenged below,

attributing Mr. Kelly's post-operative bleeding and poor healing to his anticoagulant regimen

(the "Lee Causation Opinions"):[8]

- "Dr. Lee will testify that it is probable that Mr. Kelly suffered abnormal and excessive bleeding between June 30 and July 7, 2017 that was not recognized and treated because of the lack of INR testing.  Dr. Lee will testify that it is probable that if INR tests had been performed during this period, they likely would have shown results which would have led to dose adjustments in the anticoagulation medications, which would have prevented and/or corrected the abnormal and excessive bleeding." *Id.* at 6.

- "He will testify that it is probable that Mr. Kelly continued to suffer abnormal and excessive bleeding following July 7, 2017 that was not recognized and treated because of the lack of INR testing.  Dr. Lee will testify that it is probable that if INR tests had been performed as required following July 7, they likely would have shown results which would have led to dose adjustments in the anticoagulation medications, which would have prevented and/or corrected the abnormal and excessive bleeding." *Id.* at 6-7.

- "Dr. Lee will testify that it is probable that if INR tests had been performed as required following July 14, they likely would have shown results which would have led to dose adjustments in the anticoagulation medications, which would have prevented and/or corrected the abnormal and excessive bleeding." *Id.* at 7-8.

- "Dr. Lee will testify that this negligent care and treatment caused Mr. Kelly to suffer abnormal and excessive bleeding . . . Dr. Lee will testify that if Mr. Kelly's Lovenox bridge therapy had been properly monitored and managed, he would not have suffered the abnormal and excessive post-operative bleeding that he suffered." *Id.* at 9.

### b.  Dr. Sides' Challenged Opinions

In addition, Plaintiffs disclosed Dr. Sides as a "non-specially retained expert witness[] as described in C.R.C.P. 26(a)(2)(C)."  Pls.' Init. Disc. (Ex. O) at 5.  The disclosure document attaches as Ex. I thereto a "Statement regarding Ronald Kelly" signed by Dr. Sides (Ex. Q), which includes the following opinions, challenged below, attributing Mr. Kelly's post-operative

---

[8] Similar opinions are summarized in Plaintiffs' Rebuttal Disclosures, which are not signed.  *See* Pls.' Rebuttal Disc. (Ex. S) at 2 ("Dr. Lee will testify that the Sunrise Community Health providers' mismanagement of the anticoagulation medications caused Ronald Kelly to suffer abnormal and excessive bleeding.").  These "rebuttal" opinions should be excluded for the same reasons briefed as to the opinions in the initial disclosures.  In addition, the Advisory Committee Notes to the 1993 Amendments to Rule 26(a)(2) make clear that a Rule 26(a)(2)(B) report, "which is intended to set forth the substance of the direct examination," "must be *signed by the witness*" (emphasis added).

bleeding and poor healing to his anticoagulant regimen (the "Sides Causation Opinions"):

- Mr. Kelly's "bleed[ing] as he had been doing" by the time of Dr. Sides' July 11, 2017 I&D surgery "was clearly a complication of the warfarin therapy re-introduction in conjunction with the Lovenox bridge therapy."  *Id.* at 1.

- "During the procedure a large hematoma (blood clot) was evacuated.  This is a result of the excessive bleeding that the patient was experiencing.  This resulted in dehiscence[9] of the joint capsule closure as well as the skin."  *Id.*

- "The joint capsule dehiscence is clearly a result of the hematoma and relatively poor healing since the time of the initial procedure, primary the result of the bleeding and subsequent hematoma."  *Id.* at 2.

Dr. Sides' Statement (Ex. Q) and Plaintiffs' Rebuttal Disclosures (Ex. S) also include the following opinions, evidently designed to defend medical care by Dr. Sanderford and/or other orthopedic providers at his practice (the "Sides Defense Opinions"):

- "Dr. Sanderford had clearly closed the joint capsule but this ha[d] become disrupted due to the hematoma."  Sides Statement (Ex. Q) at 1.

- "At no time did I intend to suggest by any of my statements on the chart via progress note or operative report Dr. Sanderford did not close the knee capsule appropriately for the initial knee replacement surgery.  He certainly did that and this is well documented."  *Id.* at 2.

- "Dr. Sides will rebut any opinions that either he or any member of the 'orthopedic team' failed to act appropriately and within the applicable standards of care.  He will rebut Dr. Scott's opinions that his own acts or the acts of anyone on the 'orthopedic team' were a cause of any of the injuries and damages suffered by Ronald Kelly."  Pls.' Rebuttal Disclosures (Ex. S) at 4-5.  Again, as indicated above, Plaintiffs' Rebuttal Disclosures are not signed by any of the referenced witnesses.

### c.  Dr. Sanderford's Challenged Opinions

Similarly, Plaintiffs disclosed Dr. Sanderford as a "non-specially retained expert witness[] as described in C.R.C.P. 26(a)(2)(C)."  Pls.' Init. Disc. (Ex. O) at 3-4.  The disclosure

---

[9] Dehiscence refers to separation of the edges of a surgical incision.  *See, e.g.*, Hunter, Susan, et al., *Understanding wound dehiscence*, 37 Nursing 2021 28-29 (2007), *available at* https://journals.lww.com/nursing/Citation/2007/09000/Understanding_wound_dehiscence.22.aspx.

document attaches as Ex. H thereto a "Kelly Sanderford, M.D. Statement" signed by Dr.

Sanderford (Ex. R), which includes the following opinions, challenged below, attributing Mr.

Kelly's post-operative bleeding and poor healing to his anticoagulant regimen (the "Sanderford

Causation Opinions"):

- "Based on my review of the facts and medical records, there appears to have been an inability to adequately manage Ronald Kelly's post-operative Lovenox bridge therapy following the initial surgery on June 20, 2017." *Id.* at 2.

- "As a result, Ronald Kelly suffered persistent, abnormal, and excessive bleeding. This necessitated both Dr. Sides' surgery on July 11, 2017 and my second surgery on July 19, 2017. It also resulted in my referral of Mr. Kelly to Dr. Kindsfater and two subsequent surgeries by Dr. Kindsfater." *Id.* at 3.

Dr. Sanderford's Statement and Plaintiffs' Rebuttal Disclosures (Ex. S) also include the

following opinions, evidently designed to defend medical care by PA Remley and/or other

orthopedic providers at his practice (the "Sanderford Defense Opinions"):

- As to the July 5, 2017 appointment: "it appears that Ms. Remley's actions during this office visit were reasonable and appropriate, and the findings did not require any further action by Ms. Remley at that time. Ms. Remley's care and treatment at this visit were consistent with the standards of care." Sanderford Statement (Ex. R) at 1.

- As to the July 10, 2017 appointment: "it appears that Ms. Remley's actions during this office visit were reasonable and appropriate. Ms. Remley's care and treatment during this office visit were consistent with the standards of care." *Id.*

- "I have reviewed the care provided to Ronald Kelly by myself, Dr. Sides, and Michelle Remley, PA. I believe that our care was appropriate and within the standards of care in all respects." *Id.* at 3.

- "Dr. Sanderford will rebut any opinions that either Dr. Sanderford or any member of the 'orthopedic team' failed to act appropriately and within the applicable standards of care. He will rebut Dr. Scott's opinions that the acts of Dr. Sanderford or any member of the 'orthopedic team' were a cause of any of the injuries and damages suffered by Ronald Kelly." Pls.' Rebuttal Disclosures (Ex. S) at 4. Again, this opinion is unsigned.

### d. Additional causation testimony.

To address what may be a continuing admissibility issue: during Dr. Sanderford and Dr.

Sides' depositions, Plaintiffs' counsel asked additional questions—over defense counsel's objections—to elicit even more expansive testimony regarding causation.  For example, Dr. Sides, who treated Mr. Kelly on July 10-11, 2017, was asked: "[i]s it your opinion and impression that abnormal and excessive bleeding was caused by the extended period of time that he was on Coumadin and Lovenox following the [June 20, 2017] surgery?" and "is there anything about your observations in this case that would lead you to conclude that if the abnormal and excessive bleeding had not occurred, that the original surgery performed on June 20th by Dr. Sanderford would not have gone on to be a successful total knee replacement surgery?"  Sides Dep. (Ex. F) 47:4-52:25.

STANDARD OF REVIEW

### I.      Federal Rule of Evidence 702 and *Daubert*

Federal Rule of Evidence 702 governs the admissibility of expert testimony.  It provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Rule 702 thus "imposes on a district court a gatekeeper obligation to 'ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.'"  *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1221 (10th Cir. 2003) (citation omitted); *see also Daubert*, 509 U.S. at 589-90 (district courts must evaluate whether expert opinions are "reliable").

To determine whether an expert's reasoning and methodology are reliable, and thus capable of generating admissible opinions, the Supreme Court set forth a non-exclusive list of factors for trial courts to consider, including: (1) whether the expert's theory or technique "can be and (has been) tested," (2) whether the expert's theory "has been subjected to peer review and

publication," (3) the "known or potential rate of error" and use of proper controls, and (4)

whether the expert's theory is generally accepted. *Daubert*, 509 U.S. at 593-94.

The proponent of expert testimony bears the burden of showing that it is admissible.

*Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 n.4 (10th Cir. 2001).

## II.       Federal Rule of Civil Procedure 26(a)(2)

Federal Rule of Civil Procedure 26(a)(2) separately sets forth requirements for the

disclosure of expert testimony.  If the expert is "retained or specially employed to provide expert

testimony in the case," he must produce a written report with all of the following:

> (i) A complete statement of all opinions the witness will express and the basis and
> reasons for them;
> (ii) the facts or data considered by the witness in forming them;
> (iii) any exhibits that will be used to summarize or support them;
> (iv) the witness's qualifications, including a list of all publications authored in the
> previous 10 years;
> (v) a list of all other cases in which, during the previous 4 years, the witness
> testified as an expert at trial or by deposition; and
> (vi) a statement of the compensation to be paid for the study and testimony in the
> case.

Fed. R. Civ. P. 26(a)(2)(B).  If the witness is not required to produce a written report under that

rule, a disclosure still must be produced stating "the subject matter on which the witness is

expected to present evidence under Federal Rule of Evidence 702, 703, or 705" and "a summary

of the facts and opinions to which the witness is expected to testify."  Fed. R. Civ. P. 26(a)(2)(C).

## ARGUMENT

The evidence shows that Plaintiffs have not met their burden to establish that the

foregoing expert opinions of Dr. Lee, Dr. Sides, and Dr. Sanderford are admissible under Federal

Rule of Evidence 702.  Nor were the Sanderford and Sides Causation and Defense Opinions

properly disclosed under Federal Rule of Civil Procedure 26(a)(2).

I.     **The challenged opinions should be excluded pursuant to Federal Rule of Evidence 702, *Daubert*, and its progeny.**

Plaintiffs' challenged expert opinions are are unsupported by sufficient data, are not the products of reliable principles and methods, and do not reflect analysis reliably applying evaluative methods to the facts of the case.  Fed. R. Evid. 702(b)-(d).  Nor do they bear the indicia of reliability addressed in *Daubert* and subsequent case law.  They should be excluded.

a.  **The Lee Breach Opinions are not admissible.**

Defendant is not challenging Dr. Lee's qualifications to offer opinions as a hematologist oncologist generally by reason of his "knowledge, skill, experience, training, or education."  Fed. R. Evid. 702.  However, "having general knowledge in a field is insufficient."  *City of Hobbs v. Hartford Fire Ins. Co.*, 162 F.3d 576, 587 (10th Cir. 1998).  As *Daubert* explained, an expert's opinion must be "more than a subjective belief or unsupported speculation."  509 U.S. at 590.  The proponent of the expert "must show that the method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts which sufficiently satisfy Rule 702's reliability requirements."  *Mitchell v. Gencorp, Inc.*, 165 F.3d 778, 781 (10th Cir. 1999).  Plaintiffs cannot do so here for any of Dr. Lee's opinions.

Dr. Lee's Breach Opinions boil down to the following: (1) Mr. Kelly's INR should have been tested by the Sunrise providers "daily on post-operative days 4 through 10" and otherwise until therapeutic INR results were shown for "two consecutive days," Lee Rpt. (Ex. P) at 4-5, and (2) Dr. Davis and Dr. Filipovitz did not make "appropriate and timely dose adjustments to the anticoagulation medications" based on the additional INR results that should have been obtained, *id.* at 6, 9.

From the outset, these Breach Opinions are unsupported by "sufficient facts or data." Fed. R. Evid. 702(b).  Dr. Lee explained at his deposition that his report was drafted by counsel.

Lee Dep. (Ex. C) 53:10-54:5 ("I work with the lawyers who – who obtain my services and they pretty much write this and – and fill it full of their legalese and I sign it.  I look at the paragraphs that I truly understand and correct them if needed.").  Dr. Lee has not reviewed *any* medical records from Sunrise, Banner Health, North Colorado Medical Center, or "any other provider in this case." *Id*. 49:22-52:18.  Nor has he spoken with the Kellys, Mr. Kelly's orthopedic surgeons, or their staff.  *Id.* 50:18-51:1.

Rather, Dr. Lee's opinions for this case were developed using a five-page "medical summary" that he received from Plaintiffs' counsel, which was produced to Defendant after Dr. Lee's deposition.  *Id.* 51:8-13.  Federal Rule of Evidence 703 requires that expert opinions be supported by the kinds of data that "experts in the particular field would reasonably rely on," but Plaintiffs have not shown that other physicians would rely exclusively on a short summary prepared by counsel in order to assess the medical issues on which Dr. Lee opines.

In any event, Plaintiffs' summary also omittted "sufficient facts or data" necessary to Dr. Lee's analysis.  For example, it omitted some of Mr. Kelly's INR results shown in the medical records (for June 20-21, 2017, and any dates outside the period of June 22-July 19, 2017), failed to address the doses of antibiotics Mr. Kelly was given, and does not describe the extent of bleeding and drainage that Mr. Kelly experienced the day of his initial knee replacement surgery and in the weeks after.  These were important pieces of information that an expert opining on the issues Dr. Lee opined on would need to consider; indeed, they were all considered by Defendant's anticoagulation expert, Dr. Toby Trujillo.  *See* Trujillo Rpt. (Ex. B) at 6-8.

Even if Dr. Lee had been working from sufficient data, his opinions also are not based on "reliable principles and methods."  Fed. R. Evid. 702(c).  "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to

existing data only by the *ipse dixit* of the expert." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). When Dr. Lee was asked to identify the basis for his opinion that therapeutic INR results should be shown for "two consecutive days," Lee Rpt. (Ex. P) at 5, he was unable to identify any specific publications or guidance. Instead, he stated that "I'm sure that's more than just dogma that I've been handing down to my students," and "physicians know this." Lee Dep. (Ex. C) 79:25-81:5. Plaintiffs have not offered other corroborating material.

Meanwhile, Dr. Lee relies on outdated guidance. When asked for the basis of his opinion that Mr. Kelly's INR should have been tested by the Sunrise providers "daily on post-operative days 4 through 10," Lee Rpt. (Ex. P) at 4, Dr. Lee identified guidance from a 2004 set of recommendations from the American College of Chest Physicians. He believes that guidance remains valid—despite numerous intervening guideline updates—because "nothing has changed in the world of anticoagulation that would change those guidelines." Lee Dep. (Ex. C) 70:4-72:23, 164:23-167:21. But as Dr. Trujillo has explained, "[t]here is no recommendation for daily INR monitoring" that can be found in the more recent updates from "the recommendations of the American College of Chest Physicians in either the 'Perioperative Management of Antithrombotic Therapy', nor the chapter on 'Evidence Based Management of Anticoagulant Therapy;'" in his experience, "even during initiation of therapy, INR testing typically occurs every 2-3 days," consistent with the updated "'Oral Anticoagulant Therapy' chapter." Trujillo Rebuttal Rpt. (Ex. T) at 2-3. Again, Plaintiffs have not offered other corroborating material in support of Dr. Lee's opinion.

Even if the Court were to credit Dr. Lee's interpretation of relevant medical guidance related to the standard of care, he has not reliably applied those principles and methods to his broader breach conclusions against the Sunrise providers. Fed. R. Evid. 702(d). In particular,

Dr. Lee has not supported his opinion that Dr. Davis and Dr. Filipovitz did not make "appropriate and timely dose adjustments to the anticoagulation medications" due to the lack of more frequent INR testing. Lee Rpt. (Ex. P) at 6. At no point has Dr. Lee ever clarified what dosage adjustments he believes should have been implemented differently. When asked if he thinks "the milligram level dosage adjustment[s] violated the standard of care," Dr. Lee confirmed at his deposition "[n]o, I don't think so." Lee Dep. (Ex. C) 107:23-109:13.

Finally, the broader reliability indicia set forth in *Daubert* also disfavor admitting the Lee Breach Opinions. As addressed above in Dr. Trujillo's report, Dr. Lee's views on INR timing requirements do not have "general acceptance" in the medical community. *Daubert*, 509 U.S. at 594. Indeed, when he was asked to address the fact that no "medical provider recommendations reflected in any of the medical records in this case"—even from Mr. Kelly's discharging hospital physicians, who are not affiliated with Sunrise—"recommended daily INR checks for Mr. Kelly postoperatively," Dr. Lee simply continued to assert that he was "concerned our colleagues then are erroneous in their recommendations." Lee Dep. (Ex. C) 81:6-16. Notably, Dr. Lee has worked at his current practice, Northern Hematology-Oncology, since 1997, which began as his own practice and has had only two physicians since 2000. *Id.* 28:8-29:11. To the extent that larger anticoagulation practices may have adopted newer standards, it is not clear whether Dr. Lee's clinic has done so.

*Daubert* also encourages courts to consider whether an expert's opinion "has been subjected to peer review and publication." 509 U.S. at 593-94. In this case, Dr. Lee has confirmed that he has not published anything in the past ten years, and has never published "any material related to warfarin or Lovenox." Lee Dep. (Ex. C) 36:7-37:6. Nor does he point to additional articles expressing his opinion. As *Daubert* explains, "submission to the scrutiny of

the scientific community . . . increases the likelihood that substantive flaws in methodology will be detected." 509 U.S. at 593.  That simply has not happened here.

Ultimately, the Court must determine whether "the evidence is genuinely scientific," as distinct from "unscientific speculation" offered even "by a genuine scientist." *Dodge*, 328 F.3d at 1227 (internal quotation marks omitted).  Without more, the Court is being asked to accept the *ipse dixit* of Dr. Lee in admitting the Lee Breach Opinions, and should decline to do so.  *Joiner*, 522 U.S. at 146 (1997); *see also, e.g.*, *In re Baycol Prod. Litig.*, No. 02-1124 MJD/SRN, 2008 WL 8797733, at *8–9 (D. Minn. Aug. 25, 2008) (excluding expert opinions where physician could not "cite any medical literature to support his assumption," invoked "general medical knowledge," and "relie[d] on [plaintiff's] own self-reporting as the basis of his opinions"), *aff'd,* No. 08-3303, 2009 WL 3789927 (8th Cir. Nov. 13, 2009).

### b.   The Lee, Sanderford, and Sides Causation Opinions are not admissible.

Even if the Court were to admit all of the Lee Breach Opinions, none of Plaintiffs' experts has offered reliable, admissible opinions[10] to establish *causation* supporting a negligence claim against the Sunrise providers.

As summarized above, the Lee, Sanderford, and Sides Causation Opinions purport to reach the same conclusion: that Mr. Kelly's post-operative "excessive bleeding" in June-July 2017 was attributable to the anticoagulation management of the Sunrise providers, in turn leading to his wound healing difficulties and later corrective surgeries.  Specifically:

- Dr. Lee opines that Mr. Kelly suffered "abnormal and excessive bleeding" that "was not recognized and treated because of the lack of INR testing," and that more tests "would have led to dose adjustments in the anticoagulation medications, which would have prevented

---

[10] A "treating physician's expert opinion on causation is subject to the same standards of scientific reliability that govern the expert opinions of physicians hired solely for purposes of litigation."  *Rhoads v. Hanco Int'l*, No. 02-cv-1018-D, 2003 WL 25685521, at *1 (D. Wyo. Jan. 24, 2003) (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999)).

and/or corrected the abnormal and excessive bleeding."  Lee Rpt. (Ex. P) at 6-8; *see also id.* at 9 (if "Mr. Kelly's Lovenox bridge therapy had been properly monitored and managed, he would not have suffered the abnormal and excessive post-operative bleeding that he suffered").

• Dr. Sides likewise opines that Mr. Kelly's "bleed[ing] as he had been doing" by the time of Dr. Sides' July 11, 2017 I&D surgery "was clearly a complication of the warfarin therapy re-introduction in conjunction with the Lovenox bridge therapy."  Sides Statement (Ex. Q) at 1.  He goes on to address the next step of Plaintiffs' causal chain, proposing that such bleeding resulted in a "large hematoma" and "dehiscence of the joint capsule closure as well as the skin."  *Id.*

• Dr. Sanderford offers additional conclusory opinions that "[b]ased on my review of the facts and medical records, there appears to have been an inability to adequately manage Ronald Kelly's post-operative Lovenox bridge therapy following the initial surgery on June 20, 2017," and "[a]s a result, Ronald Kelly suffered persistent, abnormal, and excessive bleeding," necessitating all of his subsequent corrective surgeries.  Sanderford Statement (Ex. R) at 2-3.

      **i.**     **The Lee, Sanderford, and Sides Causation Opinions do not comport with Federal Rule of Evidence 702 and *Daubert*.**

The foregoing causation opinions are not tied to specific symptoms, dates, dosages, or INR results, much less identified diagnostic methodologies guaranteeing reliability.  Federal Rule of Civil Procedure 702 requires more.

First, as discussed above, an expert's opinions, including on issues of causation, must derive from "sufficient facts or data."  Fed. R. Evid. 702(a).  Here, Plaintiffs' experts did not work from sufficient facts.  Like Dr. Lee, Dr. Sanderford and Dr. Sides confirmed that Plaintiffs' counsel drafted their Statements attached to Plaintiffs' expert disclosures.  Sanderford Dep. (Ex. J) 32:8-33:10; Sides Dep. (Ex. F) 18:17-19:15.  None of these experts was aware that Mr. Kelly had experienced profuse bleeding from his knee while still at the hospital the day of his initial knee replacement surgery—*i.e.*, *before* the accused anticoagulant bridging therapy ever began.  Lee Dep. (Ex. C) 159:11-25; Sanderford Dep. (Ex. J) 37:8-38:7; Sides Dep. (Ex. F) 19:23-20:10.  Like Dr. Lee, Dr. Sanderford and Dr. Sides did not review Mr. Kelly's deposition testimony or any of his Sunrise medical records.  Sanderford Dep. (Ex. J) 8:16-21, 38:14-39:7; Sides Dep.

(Ex. F) 7:9-14, 19:16-18.  And none of these experts was aware that the Kellys had contacted the orthopedic office to report concerns that Mr. Kelly's knee was draining in late June-early July 2017.  Lee Dep. (Ex. C) 160:9-22; Sanderford Dep. (Ex. J) 18:7-19:6; Sides Dep. (Ex. F) 12:6-9.

Notably, these facts were specifically referenced in and significant to the reports rendered by Defendants' retained medical experts in this case.  Without attempting to provide extensive summaries, they concluded that Mr. Kelly's wound complications, infection, and need for additional surgeries "were the result of poor wound and hematoma surveillance and management following his initial surgical procedure" and attendant delay in identifying and treating his infection, Scott Rpt. (Ex. N) at 6; that the Sunrise providers "did not do anything" to cause Mr. Kelly's prosthetic joint infection ("PJI"), which necessitated his additional surgeries,  Armitage Rpt. (Ex. M) at 8; and that Mr. Kelly's abnormal bleeding and wound healing problems were not caused by the Sunrise providers but instead attributable to "unattended structural issues within the operated-on knee" and Mr. Kelly's infection and antibiotics, Trujillo Rpt. (Ex. B) at 9.  These contrary causation opinions reached by peer physicians—who had access to more complete information—disfavor Plaintiffs' experts' reliability.  *Daubert*, 509 U.S. at 593-94.

Plaintiffs' experts' failure to consider important facts of Mr. Kelly's case also runs to *Daubert*'s fundamental concern that "[p]roposed testimony must be supported by appropriate validation—*i.e.*, 'good grounds,' based on *what is known*."  509 U.S. at 590 (emphasis added); *see also* Fed. R. Evid. 702(b).  Proper validation was impossible here for Plaintiffs' experts, in light of the conceded gaps in the relevant data that they considered.  *See, e.g.*, *Wooley v. Smith & Nephew Richards, Inc.*, 67 F. Supp. 2d 703, 708–09 (S.D. Tex. 1999) (excluding opinion on cause of "postoperative injuries" where orthopedic expert "never personally examined" the plaintiff, did not "consider[] the entirety of a patient's records," failed to identify symptoms that

"did not also exist before the surgery," and did not exclude "other possible causes"); *see also Taber v. Allied Waste Sys., Inc.*, 642 F. App'x 801, 808 (10th Cir. 2016) (where "the conclusion simply does not follow from the data, a district court is free to determine that an impermissible analytical gap exists between premises and conclusion").

Moreover, the Lee, Sanderford, and Sides Causation Opinions are not accompanied by references to any particular causation "principles and methods" that those providers applied in reaching their conclusions, Fed. R. Evid. 702(c), or how any such principles might have been applied to the specific facts of this case, *id.* 702(d).  In particular, and as discussed below, there is no indication that these experts performed meaningful differential diagnoses excluding other obvious explanations for Mr. Kelly's bleeding and subsequent complications.

> ii.    **Plaintiffs' experts did not perform differential diagnoses supporting reliable causation opinions.**

Courts routinely reject opinions on medical caustion when they are unaccompanied by evidence that the experts "systematically ruled out all other possible causes of plaintiff's alleged injuries" in a differential diagnosis.  *Rhoads*, 2003 WL 25685521, at *2.

As part of a differential diagnosis, an expert must account for "explanations that are obvious—i.e., where there is an established connection between certain possible causes and the injury."  *Taber*, 642 F. App'x at 810-11 (internal quotation marks and citations omitted); *see also, e.g.*, *Israel v. Spring Indus., Inc*., No. 98-CV-5106-ENV-RML, 2006 WL 3196956, at *5 (E.D.N.Y. Nov. 3, 2006) ("The court has discretion to exclude as 'unreliable' an expert's opinion as to the specific source or cause of a plaintiff's condition where (1) the [expert] engaged in very few standard diagnosis techniques by which doctors normally rule out alternative causes and (2) the defendant pointed to some likely cause of the plaintiff's illness other than the defendant['s] actions and [the expert] offered no reasonable explanation as to why he or she still believed that

the defendant['s] actions were a substantial factor in bringing about that illness."), *aff'd sub nom. Israel v. Springs Indus., Inc.*, No. 198-CV-05106-ENV-RML, 2007 WL 9724896 (E.D.N.Y. July 30, 2007).

To perform such a differential diagnosis, an expert must identify "all of the potential hypotheses that might explain a patient's symptoms" and "then engage in a process of elimination, eliminating hypotheses on the basis of a continuing examination of the evidence so as to reach a conclusion as to the most likely cause of the findings in that particular case." *Clausen v. M/V NEW CARISSA*, 339 F.3d 1049, 1058 (9th Cir. 2003); *see also, e.g.*, *In re Trasylol Prod. Liab. Litig.*, No. 08-CV-80419, 2010 WL 8354662, at *9 (S.D. Fla. Nov. 23, 2010) ("At the second step of a differential diagnosis, the 'rule out' step, the expert must at least consider the other causes that could have solely given rise to plaintiff's injury.").  Without such a diagnosis, the causation opinion is inadmissible.  *See Rhoads*, 2003 WL 25685521, at *2 (excluding opinion that relied primarily on "plaintiff's self-report, and a temporal relationship").

Drs. Lee, Sanderford, and Sides each failed to consider this necessary "rule out" step. They stopped at the "rule-in" step, notwithstanding the undisputed facts that Mr. Kelly was bleeding on the day of his initial knee surgery and that subsequent factors, such as infection and antibiotics, also could cause Mr. Kelly's bleeding and attendant wound healing problems.  *See, e.g.*, Lee Dep. (Ex. C) 106:12-107:16 (agreeing that "infusion of antibiotics with Coumadin" has "a high probability of causing his INR to be rapidly escalated"); *id.* 151:17-152:19 ("Levaquin, one of the antibiotics given to Mr. Kelly, is especially well-known to increase INR levels and thus increase the risk of normal and excessive bleeding," and "all antibiotics can have a significant impact on Coumadin levels," including clindamycin); Sides Dep. (Ex. F) 42:14-43:9 (agreeing that "Mr. Kelly's infection was what caused him to need subsequent knee surgeries"

and absent infection, "I think my debridement irrigation, hematoma evacuation, and subsequent polyethylene exchange probably would have been sufficient to manage his case and he probably would have healed uneventfully"); Armitage Rpt. (Ex. M) at 8 ("PJI, in turn, can contribute to elevated INRs, increased bleeding, and compromised wound healing[.]"); Davis Dep. (Ex. D) 77:4-78:4 (explaining that "infection by itself can affect an INR, and so can antibiotics that are given to treat an infection").

For example, after Dr. Lee confirmed at his deposition that he was previously unaware that Mr. Kelly "had blood running out of the bandage on the date of surgery" and "was bleeding at home the day he was discharged," he was asked if such information "would have impacted your conclusions at all."  Lee Dep. (Ex. C) 159:18-160:3.  Dr. Lee responded that he "would have wanted a more detailed evaluation of the bleeding because on the next day they were restarting the Lovenox and Coumadin" at the hospital, and "if somebody is actively bleeding the night before we would have concern whether or not that would be appropriate."  *Id.* 160:4-8.  Dr. Lee also agreed that Mr. Kelly's "incision, the wound, surgery, infections" "all played a role" in the bleeding, but did not explain why he nonetheless attributes the "predominant role" to "the mismanagement of anticoagulation" at Sunrise.  *Id.* 160:23-164:1.

Dr. Sanderford and Dr. Sides similarly did not take steps to rule out additional causes of Mr. Kelly's bleeding at the time of their treatment in July 2017, such as by aspirating the joint to take cultures or ordering bloodwork to screen for infection during Mr. Kelly's office visits. Sides Dep. (Ex. F) 13:16-14:21; Sanderford Dep. (Ex. J) 25:1-6.  Such steps were not taken even though Dr. Sanderford agreed that "we would certainly like to see the drainage stop in three to five days" after the initial surgery, due to concerns that an "open wound [] could potentially get infected."  Sanderford Dep. (Ex. J) 25:7-17.

Dr. Sides also confirmed at his deposition that he "did not" give consideration to whether there might be "any other causes" of Mr. Kelly's bleeding, including antibiotics, asserting "that's not going to be the case."  Sides Dep. (Ex. F) 25:1-26:14.  He discounted the possibility that Dr. Sanderford failed to close the initial surgical wound properly because "[w]e've done cases together" and "that would not be the situation here."  *Id.* 26:15-27:6.  And with respect to his conclusion that Mr. Kelly's continuing bleeding in turn caused dehiscence of his joint and skin, Dr. Sides made clear that his causation opinion was based on his own *ipse dixit*:

> [Y]ou can do the eyeball test on someone, they look healthy, they don't look healthy . . . I guess we were thinking about those things constantly, but not in a way that we're going to have any way to test for those things. You know, that's why we get basic labs before we do tests, because we find out things that sometimes aren't so easily retrievable with the eyeball test in a conversation or a physical exam with a patient.

*Id.* 29:24-31:21.  Such causation opinions, untested and lacking proper controls, are not admissible under *Daubert*.  509 U.S. at 593-94.

And test results *were* available here that were critical to any meaningful differential diagnoses: Mr. Kelly's INR results.  As set forth above, his INRs in the relevant period were:

| INR | Date | Provider | Record |
| --- | --- | --- | --- |
| 1.0 | 6/20/17 | North Colorado Medical Center | USA NCMC 000936 (Ex. H) |
| 1.1 | 6/21/17 | North Colorado Medical Center | USA NCMC 000936 (Ex. H) |
| 1.3 | 6/23/17 | Sunrise | USA SUNRISE 000040-000041 (Ex. E) |
| 1.6 | 6/26/17 | Sunrise | USA SUNRISE 000042-000046 (Ex. E) |
| 1.8 | 6/28/17 | Sunrise | USA SUNRISE 000053-000054 (Ex. E) |
| 1.8 | 6/30/17 | Sunrise | USA SUNRISE 000055-000056 (Ex. E) |
| 3.7 | 7/7/17 | Sunrise | USA SUNRISE 000062-000063 (Ex. E) |
| 2.8 | 7/10/17 | Sunrise | USA SUNRISE 000064-000065 (Ex. E) |
| 2.2 | 7/11/17 | North Colorado Medical Center | USA NCMC 001359 (Ex. H) |
| 2.0 | 7/12/17 | North Colorado Medical Center | USA NCMC 001359 (Ex. H) |
| 2.3 | 7/13/17 | North Colorado Medical Center | USA NCMC 001359 (Ex. H) |
| 3.8 | 7/14/17 | Sunrise | USA SUNRISE 000066-000067 (Ex. E) |
| 7.7 | 7/16/17 | North Colorado Medical Center | USA SUNRISE 000068-000081 (Ex. E) |

American College of Chest Physicians guidance explains that the "risk of bleeding in

mechanical heart valve patients is 2 out of 100 patient years for INRs from 2.5-4.9," and does not increase significantly until the INR "exceeds 4.5."  Trujillo Rebuttal Rpt. (Ex. T) at 3.  Mr. Kelly did not have an INR exceeding 3.8 in the relevant period—and generally, had INR results *below* his therapeutic range of 2.5-3.5—until July 16, 2017, after his infection had progressed and antibiotics were administered.  As Dr. Trujillo explains based on his undisputed INR results:

> The generally accepted scientific paradigm for INR values between two measurements is that there is a linear change over time.  This is known as the Rosendahl Method, and it is used to assess the quality of INR control for Anticoagulation Management Services. As such, [Mr. Kelly's'] INR *was likely never at a level that is consistent with a significantly increased risk of bleeding during this time*.

*Id.* at 5 (emphasis added).  Even Dr. Lee agreed that a patient's risks of bleeding typically would not exceed 20% with an INR result of 3.7.  Lee Dep. (Ex. C) 112:8-113:15, 131:20-23; *see also* Davis Dep. (Ex. D) 101:20-103:12 (testifying he would not be worried about INRs of 3.7-3.8 reflecting a high risk of bleeding, in view of his familiarity with Mr. Kelly's history of INR levels and the fact that INR results of 3.7-3.8 are "just outside the therapeutic range").

Against this information, the Lee, Sanderford, and Sides Causation Opinions cannot be said to reflect reasonable differential diagnoses or to have been the product of any analysis reliably applying any identified methods to the facts of the case.  Fed. R. Evid. 702(d).  Even where "obvious alternative causes may have *contributed* to an injury, even though they may not entirely exclude the causal factor favored by the plaintiff, an expert may be excluded as unreliable if he entirely fails to consider or investigate those alternatives."  *Burton v. Am. Cyanamid*, 362 F. Supp. 3d 588, 597 (E.D. Wis. 2019) (collecting cases) (emphasis in original).  The Lee, Sanderford, and Sides Causation Opinions should be excluded for the same reason.

### c.  The Sanderford and Sides Defense Opinions are not admissible.

For similar reasons, the Sanderford and Sides Defense Opinions are not admissible: they

are not based on sufficient facts or any reliable method of analysis.

Dr. Sides opines that "Dr. Sanderford had clearly closed the joint capsule but this ha[d] become disrupted due to the hematoma" after Mr. Kelly's initial surgery, a fact that he believes is "well documented." Ex. Q at 1-2. Dr. Sanderford similarly opines that "it appears that Ms. Remley's actions" at two office visits—during one of which he was on vacation—"were reasonable and appropriate, and the findings did not require any further action by Ms. Remley at that time." Ex. R at 1. He adds that he "reviewed the care provided to Ronald Kelly by myself, Dr. Sides, and Michelle Remley, PA" and "believe[s] that our care was appropriate and within the standards of care in all respects." *Id.* at 3.[11]

First, these opinions are not the products of "sufficient facts or data," Fed. R. Evid. 702(b). Dr. Sanderford and Dr. Sides apparently were unaware of (1) profuse bleeding from Mr. Kelly's knee shortly after Dr. Sanderford's initial surgery, and (2) repeated calls to their office in which the Kellys relayed concerning symptoms including "drainage," "oozing," "swelling," and "redness." To the extent that Dr. Sides offers the vague assertion that Dr. Sanderford's joint capsule closure is "well documented," such documentation is not specified, and he does not otherwise identify any actual "*facts or data*" that he has "been made aware of or personally observed" to support his conclusion. Fed. R. Evid. 703 (emphasis added). The same is true with respect to Dr. Sanderford's unsupported opinion that "it appears that Ms. Remley's actions" during two office visits "were reasonable and appropriate" based on his review of unspecified records. Sanderford Statement (Ex. R) at 1.

---

[11] Plaintiffs also, in unsigned opinions, indicate that Dr. Sides and Dr. Sanderford will be asked to "rebut any opinions" that Dr. Sanderford "or any member of the 'orthopedic team' failed to act appropriately and within the applicable standards of care" or "were a cause of any of the injuries and damages suffered by Ronald Kelly." Pls.' Rebuttal Disclosures (Ex. S) at 3-5.

Second, Drs. Sanderford and Sides have not identified "reliable principles and methods," Fed. R. Evid. 702(c), by which they reached their opinions that every member of their practice acted "within the applicable standards of care" and did not "cause of any of the injuries and damages suffered by Ronald Kelly."  Pls.' Rebuttal Disclosures (Ex. S) at 3-5.  Even if they had, it is clear they could not have reliably applied such methods to the facts of this case, Fed. R. Evid. 702(d), given the absence of meaningful differential diagnoses evaluating the impacts of their own care and factors like infection and antibiotics, as set forth above.

Third, Drs. Sanderford and Sides' Defense Opinions lack any of the basic indicia of reliability addressed in *Daubert*.  There is no indication whatsoever that their Defense Opinions have been tested, were subjected to peer review, or are generally accepted.  *Daubert*, 509 U.S. at 593-94.  Nor is it clear what "potential rate of error" might apply to Dr. Sanderford and Dr. Sides' Defense Opinions, *Daubert*, 509 U.S. at 593-94, and Defendant respectfully submits that those opinions should be considered in light of the contrary conclusions of other practitioners, as well as Dr. Sanderford and PA Remley's status as designated non-parties at fault in this case.

## II.     The Sanderford and Sides Causation and Defense Opinions should be stricken for failure to comply with Federal Rule of Civil Procedure 26(a)(2).

Yet another problem with the Sanderford and Sides Causation and Defense Opinions is that they were not disclosed in compliance with Federal Rule of Civil Procedure 26(a)(2).  As addressed below, the requirements of that rule apply not only to Dr. Lee, Plaintiffs' retained witness, but also to Mr. Kelly's treating physicians, Drs. Sanderford and Sides, where those opinions exceed the scope of treatment.  Even if the Court finds that Rule 26(a)(2)(B) reports were not required, these providers' disclosures also would be deficient under Rule 26(a)(2)(C).

The challenged opinions should be stricken (*i.e.*, excluded)[12] on that basis.  *See* Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.").

       **a.  The Sanderford and Sides Causation and Defense Opinions were not disclosed in compliance with Rule 26(a)(2).**

The Sanderford and Sides Causation and Defense opinions were not disclosed in compliance with Rule 26(a)(2)(B) or even Rule 26(a)(2)(C).

       **i.  The Sanderford and Sides Causation and Defense Opinions violate Rule 26(a)(2)(B), which applies to those opinions.**

The requirements of Rule 26(a)(2)(B) apply if an expert is "retained or specially employed to provide expert testimony in the case."  Those requirements include: "(i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the facts or data considered by the witness in forming them; (iii) any exhibits that will be used to summarize or support them; (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years; (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and (vi) a statement of the compensation to be paid for the study and testimony in the case."  *Id.*

Pursuant to the Court's Scheduling Order, initial expert disclosures under Rule 26(a)(2) were due in this case on November 18, 2020, and rebuttal disclosures were due on December 16, 2020.  ECF No. 34.  Dr. Sanderford and Dr. Sides were disclosed on November 18, 2020 as

---

[12] Decisions involving similar deficiencies often refer to "striking" expert disclosures that do not comply with Rule 26, even though they are not pleadings or filed documents.  Put differently, Defendant asks that the Court exclude the pertinent opinions from consideration on motions or at trial for failure to comply with Rule 26.  *See* Fed. R. Civ. P. 37(c)(1).

"non-specially retained expert witnesses as described in C.R.C.P. 26(a)(2)(C)."  Pls.' Init. Disc.

(Ex. O) at 3-5.  Their two- and three-page sworn "Statements" attached to Plaintiffs' initial

expert disclosures fail to provide the items required under Rule 26(a)(2)(B), including "complete

statement[s]" of their opinions, lists of any "facts or data" they considered, or descriptions of

their qualifications, publications, prior testimony, and any compensation.  *See generally* Sides

Statement (Ex. Q); Sanderford Statement (Ex. R).  Nor is such information included with the

unsigned summary opinions attributed to them in Plaintiffs' Rebuttal Disclosures.  Ex. S at 3-5.

While reports under Rule 26(a)(2)(B) would not have been required for Dr. Sanderford

and Dr. Sides as treating physicians if they confined their opinions to the scope of their own

treatment of Mr. Kelly, they offered other opinions as well.  Because their Causation and

Defense Opinions go well beyond their "observations during the course of treating the party

designating them," Rule 26(a)(2)(B) reports were required.  *Washington v. Arapahoe Cnty. Dep't

of Soc. Servs.*, 197 F.R.D. 439, 442 (D. Colo. 2000); *see also, e.g.*, *Kelly v. Union Pac. R.R. Co.*,

No. 08-CV-088-J, 2008 WL 11335008, at *6 (D. Wyo. Nov. 10, 2008) (holding "that a treating

physician is no longer testifying simply as a treating physician when he testifies to issues such as

causation of injury, degree and permanency of disability, prognosis, and the need for future

medical care," and Rule 26(a)(2)(B) reports are required).

"Rule 26 focuses not on the status of the witness, but rather on the substance of the

testimony."  *Washington*, 197 F.R.D. at 442; *see also Harvey v. United States*, No. 04-CV-

00188-WYD-CBS, 2005 WL 3164236, at *8 (D. Colo. Nov. 28, 2005), *report and

recommendation adopted sub nom. Est. of Harvey, ex rel. Grace v. United States*, 2006 WL

2505850 (D. Colo. Aug. 28, 2006) ("The disclosure requirements under Rule 26(a)(2)(B),

however, should not turn on the expert's label or classification.").  Courts therefore have

excluded treating physician testimony in the absence of Rule 26(a)(2)(B) reports where: (1) "the physician's causation opinion was developed in response to a request from counsel," *Krischel v. Hennessy*, 533 F. Supp. 2d 790, 797 (N.D. Ill. 2008); *see also Harvey*, 2005 WL 3164236, at *9; or (2) the provider will address the "applicable standard of care" and "the appropriateness of care and treatment provided by a previous medical practitioner," *Harvey*, 2005 WL 3164236, at *8-9. *Cf. Kilpatrick v. Moala*, No. 2017-CV-030829, 2018 WL 2198788, at *4 (Colo. Dist. Ct. Feb. 06, 2018) (under parallel Colorado rules, "if the treating physician offers opinions that (1) were not formed within the ordinary course of medical treatment; (2) were based upon information acquired from outside sources that were not used as part of the ordinary course of medical treatment; or (3) such opinion was directed to issues specifically raised by this lawsuit, then they must opine as a retained expert").

The Sanderford and Sides Causation Opinions reflect these types of conclusions that must be set forth in Rule 26(a)(2)(B) reports, which Plaintiffs failed to provide here. For example, Dr. Sides opines that Mr. Kelly's "bleed[ing] as he had been doing" prior to Dr. Sides' July 11, 2017 I&D surgery "was clearly a complication of the warfarin therapy re-introduction in conjunction with the Lovenox bridge therapy," which "resulted in dehiscence of the joint capsule closure as well as the skin." Ex. Q 1 (emphasis added). In his Statement, Dr. Sanderford similarly opines that "*[b]ased on my review of the facts and medical records*, there appears to have been an inability to adequately manage Ronald Kelly's post-operative Lovenox bridge therapy following the initial surgery on June 20, 2017." Ex. R at 2 (emphasis added). He asserts that "[a]s a result, Ronald Kelly suffered persistent, abnormal, and excessive bleeding," which "necessitated" all of Mr. Kelly's subsequent surgeries. *Id.* at 3.

For Plaintiffs to offer these Causation Opinions—which are not linked to specific and

identified observations from the time of treatment, were drafted by Plaintiffs' counsel, and were prepared "in response to a request" for use in litigation—Plaintiffs were required to disclose Rule 26(a)(2)(B) reports, and nondisclosure bars their use. *Krischel*, 533 F. Supp. 2d at 797 (granting motion to strike or compel report and explaining that treating physician "would be required to prepare a Rule 26(a)(2)(B) report in order to testify that the cause of [plaintiff's] 2007 surgery was the Defendants' actions in 2005"); *see also Harvey*, 2005 WL 3164236, at *9 (citing with approval *Zarecki v. National Railroad Passenger Corp.,* 914 F.Supp. 1566, 1573 (N.D. Ill. 1996) (rejecting plaintiff's argument that a treating physician was exempt from reporting requirement where the physician's testimony concerned professional opinions developed for trial)); *Dedmon v. Cont'l Airlines, Inc.*, No. 13-CV-0005-WJM-NYW, 2015 WL 1040521, at *5, 7 (D. Colo. Mar. 6, 2015) (striking fourteen treating physician experts on topics including "causation, damages, prognosis, [and] impairment" for failure to provide Rule 26(a)(2)(B) reports, and limiting testimony of two other physicians).

Similarly, the Sanderford and Sides Defense Opinions regarding whether other providers met the standard of care should have been disclosed in Rule 26(a)(2)(B) reports. Dr. Sides opines that "Dr. Sanderford had clearly closed the joint capsule but this ha[d] become disrupted due to the hematoma" after Mr. Kelly's initial surgery, a fact that he believes is "well documented." Ex. Q at 1-2. Dr. Sanderford similarly opines that "it appears that Ms. Remley's actions" at two office visits—during one of which he was on vacation—"were reasonable and appropriate, and the findings did not require any further action by Ms. Remley at that time." Ex. R at 1. He adds that he "reviewed the care provided to Ronald Kelly by myself, Dr. Sides, and Michelle Remley, PA" and "believe[s] that our care was appropriate and within the standards of care in all respects." *Id.* at 3. Furthermore, Dr. Sides and Dr. Sanderford evidently will "rebut

any opinions" that Dr. Sanderford "or any member of the 'orthopedic team' failed to act appropriately and within the applicable standards of care" or "were a cause of any of the injuries and damages suffered by Ronald Kelly," although such purported opinions are unsigned by the witnesses.  Pls.' Rebuttal Disclosures (Ex. S) at 3-5.

These Defense Opinions "concern[] professional opinions developed for trial," *Harvey*, 2005 WL 3164236, at *9, and should have been the subject of Rule 26(a)(2) reports.  That is particularly the case to the extent Dr. Sanderford and Dr. Sides were asked "to review medical records" or other facts outside of their own care "in order to render opinion testimony concerning the appropriateness of the care and treatment of [other] provider[s]."  *Trejo v. Franklin*, No. CIV. 04-CV-02523-REB, 2007 WL 2221433, at *1–2 (D. Colo. July 30, 2007) ("None of these defendants or former defendants may opine as to whether any other defendant or former defendant met the applicable standard of care in providing treatment to [plaintiffs] because none has provided a written report that complies with Rule 26(a)(2)(B).").

>           ii.     **The Sanderford and Sides Causation and Defense Opinions violate Rule 26(a)(2)(C).**

Even if the Court were to conclude that Drs. Sanderford and Sides were *not* required to produce Rule 26(a)(2)(B) reports as to their Causation and Defense Opinions, their disclosures failed to satisfy even Rule 26(a)(2)(C).  That rule requires a meaningful "summary of the facts and opinions to which the witness is expected to testify," even for non-retained experts.  Fed. R. Civ. P. 26(a)(2)(C).  *See Dedmon*, 2015 WL 1040521, at *5 (finding treating physician disclosures deficient under Rule 26(a)(2)(C) where they failed to provide a "meaningful understanding of the subject matter of the opinion(s), or the factual basis of such opinion(s)"); *Est. of Grubbs v. Weld Cnty. Sheriff's Office*, No. 16-CV-00714-PAB-STV, 2018 WL 8838810, at *3 (D. Colo. July 20, 2018) (disclosure explaining that treating physician would testify as to

plaintiff's "causes of death, suicide attempt, substance overdose, Percocet overdose, and Valium overdose" were deficient under Rule 26(a)(2)(C) despite recitation of facts that plaintiff "presented to the hospital in cardiopulmonary arrest," was "defibrillated and required intubation," and "took approximately 60 10 mg Valium pills and 75 10/325 Percocet pills").

Here, Plaintiffs' expert disclosures provide even less factual specificity than in *Grubbs*. They do not identify specific facts supporting the Sanderford and Sides Causation Opinions that Mr. Kelly's bleeding and attendant wound healing problems were caused by his anticoagulants, or even what "facts and medical records" the providers reviewed to reach such determinations. Sanderford Statement (Ex. R) at 2.  *Cf. Kilpatrick*, 2018 WL 2198788, at *4-5 (a treating physician "must disclose his or her specific opinion on causation and the basis and reasons for the opinion," and a "party cannot circumvent the requirement for full disclosure of expert opinions by simply labeling an expert as 'non-retained'").  To the extent that the providers believe support for their Defense Opinions is "well documented," Sides Statement (Ex. Q) at 1-2, or apparent from a "review[] [of] the care provided" by their colleagues, Sanderford Statement (Ex. R) at 3, they fail to identify such support.  Such disclosures fall short of even the more modest disclosure requirements of Rule 26(a)(2)(C).

### b.  The foregoing violations of Rule 26(a)(2) were not substantially justified or harmless.

If a party fails to disclose an expert witness as required under Rule 26(a)(2), that party may not "use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).  The party who fails to properly disclose has the burden of showing that its failure was substantially justified or harmless.  *Grubbs*, 2018 WL 8838810, at *3 (citation omitted).  Although "[t]he determination of whether a Rule 26(a) violation is justified or harmless is entrusted to the broad

discretion of the district court," the Tenth Circuit has suggested four factors to consider: "(1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness." *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir. 1999).

> As a District of Wyoming court explained:

> Once a treating physician begins to extrapolate his opinions from circumstances beyond those made in the immediate course of care to issues such as, for example, *causation of injury*, *reasonableness of care*, degree and permanency of disability, prognosis, and the need for future medical care, *the opposing party would be unduly prejudiced if it did not receive an advance designation complete with expert report detailing the opinions and how the opinions were formed*.

*Kelly*, 2008 WL 11335008, at *6 (emphases added). As a practical example, Defendant incurred additional costs to have its retained orthopedic expert prepare a rebuttal to Dr. Sanderford and Dr. Sides' Statements, which effectively had to infer the unspecified bases for the providers' opinions and respond thereto. *See, e.g.*, Scott Rebuttal Rpt. (Ex. U) at 3 ("disagreeing with any implication" in Dr. Sanderford's Statement that causation could be inferred from use of blood products for surgery); *id.* at 4 (evaluating impact of facts and records on Dr. Sides' opinions but noting it "is not entirely clear from Dr. Sides' statement or the medical records" whether he was aware of such facts).

Although Defendant took the depositions of Dr. Sanderford and Dr. Sides in an effort to cure such prejudice, preparations and efforts to meaningfully discuss the issues with the witnesses were compromised by the absence of specific information in Plaintiffs' disclosures, including what facts or records they reviewed. For example, it was not confirmed until the time of the providers' depositions that they were unaware of Mr. Kelly's bleeding the day of his initial June 20, 2017 surgery, that neither of them had reviewed any Sunrise medical records, and that

both had received draft "Statements" from Plaintiffs' counsel.[13]

Furthermore, Plaintiffs made a conscious decision not to produce additional disclosures. *See* Sides Dep. (Ex. F) 49:15-50:25 (Plaintiffs' counsel contended that questions seeking to elicit broad testimony regarding causation were "appropriately covered by" the Sides Statement). Even in the absence of bad faith, the Court should not "reward Plaintiff's lack of diligence." *Dedmon*, 2015 WL 1040521, at *7. At a minimum, the Court should limit testimony by Dr. Sanderford and Dr. Sides to "observations and opinions clearly reflected in their respective medical records." *Id.* at *8; *see also, e.g.*, *Ray v. Huntington Ingalls Inc.*, No. 1:13-CV-23-HSO-RHW, 2013 WL 11325248, at *1 (S.D. Miss. Aug. 22, 2013) ("The Court finds that the testimony of Dr. McNair and Dr. Zayed should be limited to the treatment they provided to Plaintiff as reflected in their respective medical records."). The far more expansive Causation and Defense Opinions "introduced during their respective depositions" and in their Statements should be stricken. *Id.* at *7.

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court: (1) preclude the Causation, Breach, and Defense Opinions of Dr. Lee, Dr. Sanderford, and Dr. Sides pursuant to Federal Rule of Evidence 702, and (2) strike the Sanderford and Sides Causation and Defense Opinions under Federal Rules of Civil Procedure 26 and 37.

---

[13] In addition, while it is not Plaintiffs' fault, Dr. Sanderford and Dr. Sides' depositions had to be sequentially rescheduled at the request of their counsel, to the point that Dr. Sides' deposition did not occur until after discovery otherwise had closed. *See* ECF No. 37, 38.

DATED at Denver, Colorado this 24th day of March, 2021.

MATTHEW T. KIRSCH
Acting United States Attorney

*s/ Elizabeth Hagerty*
Elizabeth Hagerty
Assistant United States Attorney
United States Attorney's Office
1801 California Street, Ste. 1600
Denver, CO 80202
Tel. (303) 454-0101
Fax (303) 454-0411
elizabeth.hagerty@usdoj.gov

*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on March 24, 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following e-mail addresses:

john@jomlegal.com

*s/ Elizabeth Hagerty*
Elizabeth Hagerty
Assistant United States Attorney

*Counsel for Defendant*