## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-03630-NYW

RONALD KELLY, and
SHELLI KELLY,

      Plaintiffs,

v.

UNITED STATES OF AMERICA,

      Defendant.

---

### DEFENDANT'S  MOTION FOR SUMMARY JUDGMENT

---

Pursuant to Federal Rule of Civil Procedure 56, Defendant moves for an order of summary judgment in its favor on Plaintiffs' claims for negligence and loss of consortium.

### INTRODUCTION

Plaintiffs' claims in this case are brought against the United States pursuant to the Federal Tort Claims Act ("FTCA") and challenge medical care provided to Mr. Kelly by six primary care providers at Sunrise Community Health clinics ("Sunrise"), principally Dr. Samuel Davis and Dr. Sean Filipovitz, during a period of weeks in June-July 2017.  Compl. ¶¶ 4, 9, 11.

Plaintiffs' theory is that those providers did not manage Mr. Kelly's anticoagulation medications properly after a total knee replacement surgery, and that such omissions caused his knee to bleed.  The Complaint's selective recitation of his medical history is as follows: due to a prosthetic heart valve, Mr. Kelly takes the daily anticoagulant medication Coumadin (warfarin).[1]

---

[1] The parties have referred to "Coumadin," a branded product, interchangeably with "warfarin," the generic equivalent, in depositions and other case documents. *See, e.g.*, Compl. ¶ 16.

*Id.* ¶ 16.  Following an initial knee replacement surgery on June 20, 2017, the Sunrise providers allegedly "failed to appropriately manage Plaintiff Ronald Kelly's [anticoagulant] bridge therapy" with Coumadin and another medicine, Lovenox (enoxaparin), through sufficiently frequent blood tests and dose adjustments, causing him to experience "abnormal and excessive bleeding and a failure of his surgical wound to heal."  *Id.* ¶¶ 23-26.  After a knee irrigation and debridement ("I&D") surgery on July 11, 2017, Plaintiffs allege that the Sunrise providers again "failed to appropriately manage" Mr. Kelly's bridge therapy, causing more bleeding and poor wound healing.  *Id.* ¶¶ 27-29.  Plaintiffs allege that this "continued excessive bleeding, failure to heal, and infection" caused Mr. Kelly to require three more corrective surgeries to remove and eventually reimplant his knee hardware.  *Id.* ¶¶ 31-33.

But the undisputed record evidence fails to support this theory at every turn.  First, and perhaps most glaringly, Mr. Kelly's excessive bleeding started right after his initial knee replacement surgery—*before* the accused post-operative anticoagulant bridging ever began.  As described at length at his deposition, Mr. Kelly "had blood running out of the bandage" on his knee after walking down the hospital hallway later on the day of his first surgery.  R. Kelly Dep. (Ex. A)[2] 46:15-49:9 (describing discovery of a discharged "blood clot the size of my hand").

Second, there is no dispute that Mr. Kelly's surgical wound remained open after his initial bleeding incident at the hospital, allowing an infection to develop that severely complicated his recovery.  At follow-up appointments in early July 2017, Dr. Sanderford and his colleagues, Physician Assistant ("PA") Michelle Remley and Dr. Steven Sides, observed that Mr. Kelly's surgical wound remained "open" and prescribed clindamycin.  Sanderford Dep. (Ex. J)

_____

[2] All exhibits cited herein are identified using the same lettering with which they were marked attached to Defendant's Motion to Partially Exclude Testimony and Strike Expert Disclosures of Dr. William Eng Lee, Dr. Steven Sides, and Dr. Kelly Sanderford.

20:21-23:23; Remley Dep. (Ex. K) 21:23-23:23; Sides Dep. (Ex. F) 12:13-13:7.  After bacterial cultures confirmed that Mr. Kelly had infections with *e. coli* and two *staphylococcus* organisms, USA NCMC 003750-003754 (Ex. H), intravenous Levaquin (levofloxacin) and daptomycin were given to Mr. Kelly at the hospital.  USA NCMC 001572-001574 (Ex. H); S. Kelly Dep. (Ex. G) 86:20-87:10.  As Plaintiffs' standard of care expert, Dr. William Eng Lee, explains, "Levaquin, one of the antibiotics given to Mr. Kelly, is especially well-known to increase INR levels and thus increase the risk of normal and excessive bleeding," and indeed "all antibiotics can have a significant impact on Coumadin levels."  Lee Dep. (Ex. C) 151:17-152:19.

Third, throughout the relevant period, Mr. Kelly was taking international normalized ratio ("INR") blood tests to monitor his anticoagulation levels.  Prior to the administration of intravenous antibiotics, he never received a result above 3.8, which is not a level high enough to signal a major risk of bleeding.  *See* Trujillo Rpt. (Ex. B) at 6-8 (summarizing records).  Even Dr. Lee agrees that a patient's risks of bleeding are low in such INR ranges.  *See* Lee Dep. (Ex. C) 112:8-113:15, 131:20-23 (risk of bleeding would not exceed 20% with an INR result of 3.7); *see also* Trujillo Rebuttal Rpt. (Ex. T) at 3 (explaining that the "risk of bleeding in mechanical heart valve patients is 2 out of 100 patient years for INRs from 2.5-4.9," and does not increase significantly until the INR "exceeds 4.5").

Against this factual record, and in light of deficiencies in their expert disclosures, Plaintiffs cannot establish a *prima facie* claim for negligence against the Sunrise providers.  This motion briefs three issues that should be dispositive of all or part of Plaintiffs' claims.

First, as set forth in Defendant's accompanying Motion to Partially Exclude Testimony and Strike Expert Disclosures of Dr. William Eng Lee, Dr. Steven Sides, and Dr. Kelly Sanderford ("Defendant's *Daubert* Motion") pursuant to Federal Rule of Evidence 702 and/or

Federal Rule of Civil Procedure 26(a)(2), Plaintiffs lack admissible and properly disclosed expert testimony to establish several of the elements of a negligence claim, specifically standard of care, breach, and causation.  If the Court agrees and excludes or strikes the testimony that is challenged in Defendant's *Daubert* Motion—which is "essential to plaintiff[s'] negligence case"—Defendant will be "entitled to judgment as a matter of law."  *Solorio v. U.S.*, 85 F. App'x 705, 709, 711 (10th Cir. 2004).[3]

Second, even if Plaintiffs' expert opinions are *not* excluded, Plaintiffs still cannot support the following discrete components of their claim, as to which the Court should grant partial summary judgment:

(1)     Plaintiffs appear to contend, through Dr. Lee's expert report, that the Sunrise providers "did not make appropriate and timely dose adjustments to [Mr. Kelly's] anticoagulation medications."  Lee Rpt. (Ex. P) at 9.  However, to the extent that this assertion relates to dose adjustments of Mr. Kelly's Coumadin, Dr. Lee subsequently confirmed at his deposition that such adjustments did *not* violate the standard of care.

(2)     To the extent that Plaintiffs allege that Mr. Kelly's "continued excessive bleeding,

---

[3] Counsel recently was advised with respect to a different case that this Court may find it preferable in practice to receive motions under Federal Rule of Evidence 702 and/or Federal Rule of Civil Procedure 26(a)(2) farther in advance of corresponding dispositive motions.  Such guidance will be taken into account moving forward.  For present purposes, Defendant respectfully submits that it endeavored to submit the instant motion and Defendant's *Daubert* Motion in parallel, in view of the Court's Practice Standard 7.1(b) (setting such deadlines concurrently) and decisions of other courts cited herein ruling together on such simultaneously filed motions.  *See, e.g.*, *Nash v. Wal-Mart*, No. 15-cv-02330-RM-MEH, 2016 WL 10519158, at *1 (D. Colo. Dec. 5, 2016) (recommending granting defendant's motion to strike expert and corresponding motion for summary judgment filed on the same date), *report and recommendation adopted as modified sub nom. Nash v. Wal-Mart Stores, Inc.*, 2017 WL 5188339 (D. Colo. Feb. 15, 2017), *aff'd,* 709 F. App'x 509 (10th Cir. 2017).  Defendant respectfully requests that the Court consider its accompanying *Daubert* Motion in advance of or concurrently with the instant motion, so that their arguments may be considered in parallel.

failure to heal, and infection" caused Mr. Kelly to require three subsequent surgeries to remove and eventually replace his prosthetic knee, Compl. ¶¶ 31-33, they have not proffered evidence that the corrective surgeries were necessitated by the allegedly negligent conduct of the Sunrise providers—*even assuming that such negligence occurred*.

Plaintiffs' experts have opined that the Sunrise providers' alleged mismanagement of Mr. Kelly's anticoagulation regimen caused his "excessive bleeding."  For the reasons addressed in Defendant's *Daubert* Motion, those opinions are not admissible under Federal Rule of Evidence 702, and they should be stricken for disclosure deficiencies under Federal Rule of Civil Procedure 26(a)(2).  But even if the Court were to find those opinions admissible, procedurally adequate, and correct on the merits, they still would not permit a rational factfinder to make the *further* inference that such bleeding was what caused Mr. Kelly to require additional surgeries. To the contrary, Dr. Steven Sides, who performed Mr. Kelly's July 11, 2017 I&D surgery, confirmed that "Mr. Kelly's infection was what caused him to need subsequent knee surgeries," and he otherwise "probably would have healed uneventfully."  Sides Dep. (Ex. F) 42:14-43:9.

(3)     Finally, as a comparatively minor point in the case, Sunrise PA Meryn Harwood included in a clinic note an erroneous statement that Mr. Kelly "Needs to D/C [discontinue] Warfarin once at therapeutic range" and "Continue Warfarin until therapeutic."  USA SUNRISE 000042-000046 (Ex. E).  All parties recognize that Mr. Kelly needs to be on Coumadin permanently, given his artificial aortic valve.  Dr. Lee characterizes PA Harwood's clinic note as "negligent," Lee Rpt. (Ex. P) at 5, making it Plaintiffs' only other potential allegation of any breach of a standard of care—outside of the INR testing and dosage adjustment decisions discussed above—by any Sunrise provider.  But it is undisputed that PA Harwood's referenced note reflected a recognized typographical error and had no actual impact on Mr. Kelly's care.

For each of these reasons, summary judgment is warranted for Defendant.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

The following facts are material and undisputed.

1.      Since about 1991, Mr. Kelly has been taking the daily anticoagulant medication Coumadin to prevent blood clotting.  Compl. ¶ 16; R. Kelly Dep. (Ex. A) 15:23-16:3.

2.      Since about 1991, Mr. Kelly has taken regular INR blood tests, which monitor his levels of anticoagulation.  R. Kelly Dep. (Ex. A) 16:22-17:19; Exp. Rpt. of Dr. Toby C. Trujillo (Ex. B) at 5.  Mr. Kelly's "goal" or "therapeutic" INR range is 2.5-3.5, which was set by his cardiologist.  R. Kelly Dep. (Ex. A) 18:16-22; Trujillo Rpt. (Ex. B) at 5.

3.      A low or "subtherapeutic" INR is associated with higher risks of clotting, while a high or "supratherapeutic" INR is associated with comparatively increased risks of bleeding. Trujillo Rpt. (Ex. B) at 8-9; Lee Dep. (Ex. C) 60:9-17.

4.      In June 2017, an anticoagulant bridging plan was put in place for Mr. Kelly, which called for him to stop taking Coumadin several days prior to surgery; take a short-acting medication, Lovenox, in the days leading up to surgery; restart Coumadin and Lovenox post-operatively; and discontinue Lovenox once his INR results reached a "therapeutic" level over 2.5.  Trujillo Rpt. (Ex. B) at 6; USA SUNRISE 000025-000027 (Ex. E); *see also* Compl. ¶¶ 20-21; Sides Dep. (Ex. F) 17:22-18:16.

5.      On June 20, 2017, Mr. Kelly underwent an initial right total knee replacement surgery, which was performed by Dr. Sanderford.  Compl. ¶ 23; Ans. ¶ 23; R. Kelly Dep. (Ex. A) 46:12-14.

6.      While Mr. Kelly was inpatient for his surgery at the hospital, North Colorado Medical Center, his anticoagulant bridge therapy was managed by the hospital staff, not the

Sunrise providers.  Davis Dep. (Ex. D) 38:2-9; Sanderford Dep. (Ex. H) 48:15-22.

7.    Later on the day of his initial knee replacement surgery, Mr. Kelly had "had blood running out of the bandage" on his knee.  R. Kelly Dep. (Ex. A) 46:15-47:2.  After Mr. Kelly's bandage was unwrapped, it was discovered that he had discharged a "blood clot the size of my hand."  R. Kelly Dep. (Ex. A) 46:15-49:9.

8.    The Kellys repeatedly reached out to Dr. Sanderford's office over the next two weeks to report Mr. Kelly's knee experiencing "drainage," "oozing," "extensive bruising," and "redness," among other symptoms.  S. Kelly Dep. (Ex. G) 58:20-61:25, 64:7-65:8, 65:14-66:11.

9.    On July 5, 2017, at his first orthopedic follow-up appointment after his knee replacement surgery, PA Remley and Dr. Sanderford examined Mr. Kelly, observed that his surgical wound still was "open," and prescribed clindamycin.  Sanderford Dep. (Ex. J) 20:21-23:23; Remley Dep. (Ex. K) 21:23-23:23, 24:12-25:6; *see also* USA NCMC ORTHO 000008-000010 (Ex. I).

10.    Mr. Kelly went in for his next follow-up appointment at Dr. Sanderford's practice on July 10, 2017, USA NCMC ORTHO 000005-000007 (Ex. I), during which Dr. Sides observed that the surgical wound "was not in continuity," Sides Dep. (Ex. F) 11:24-12:5.

11.    Dr. Sides performed an I&D and wound closure surgery for Mr. Kelly on July 11, 2017.  Sides Dep. (Ex. F) 12:13-13:7.  Mr. Kelly was placed back on Lovenox around the time of surgery by providers at the hospital, not Sunrise.  Filipovitz Dep. (Ex. L) 103:2-14; Sides Dep. (Ex. F) 37:12-38:17; *see also* Trujillo Rpt. (Ex. B) at 7.

12.    Bacterial cultures obtained during the I&D surgery showed infections with *e. coli* and two *staphylococcus* organisms.  USA NCMC 003750-003754 (Ex. H); Exp. Rpt. of Dr. Keith B. Armitage (Ex. M) at 5; Exp. Rpt. of Dr. Richard D. Scott (Ex. N) at 3.

13.     On July 15, 2017, the intravenous antibiotics Levaquin and daptomycin were given to Mr. Kelly at the direction of Dr. Ronald Quenzer at the hospital.  USA NCMC 001572-001574 (Ex. H); S. Kelly Dep. (Ex. G) 86:20-87:10.

14.     The antibiotics prescribed to Mr. Kelly between July 5, 2017-July 15, 2017 can increase INR results and cause bleeding.  Lee Dep. (Ex. C) 151:17-152:19 ("Levaquin, one of the antibiotics given to Mr. Kelly, is especially well-known to increase INR levels and thus increase the risk of normal and excessive bleeding," and "all antibiotics can have a significant impact on Coumadin levels," including clindamycin); *id.* 106:12-107:16 (agreeing that "infusion of antibiotics with Coumadin" has "a high probability of causing his INR to be rapidly escalated"); Armitage Rpt. (Ex. M) at 6-7 ("Any antibiotic can lead to an increase in the INR," "it is likely" that the clindamycin prescribed to Mr. Kelly's elevated his INR, and Dr. Quenzer's administration of Levaquin on July 15, 2017 "was likely a significant contributor to the excessive bleeding and INR of 7.7 on July 16"); Davis Dep. (Ex. D) 77:4-78:4 (explaining that "infection by itself can affect an INR, and so can antibiotics that are given to treat an infection").

15.     Infection also can increase INR results and cause bleeding and poor wound healing.  Lee Dep. (Ex. C) 160:23-164:1 (Mr. Kelly's "wound, surgery, infections" "all played a role" in his bleeding); Sides Dep. (Ex. F) 42:14-43:9 (agreeing that "Mr. Kelly's infection was what caused him to need subsequent knee surgeries"); Armitage Rpt. (Ex. M) at 8 (prosthetic joint infection can lead to "increased bleeding and compromised wound healing"); *see also* Trujillo Rpt. (Ex. B) at 9 (Mr. Kelly's bleeding after July 10, 2017 can be "partially ascribed to the fact the patient was infected and receiving antibiotics that directly interacted with warfarin and leading to an increased INR"); Davis Dep. (Ex. D) 77:4-78:4 (explaining that "infection by itself can affect an INR").

16.     On July 19, 2017, Dr. Sanderford removed Mr. Kelly's prosthetic knee implant. Compl. ¶ 31; Ans. ¶ 31; R. Kelly Dep. (Ex. A) 89:12-19.

17.     On October 21, 2017, Mr. Kelly underwent an unsuccessful surgery by Dr. Kirk Kindsfater, at a different orthopedic practice, in an attempt to reimplant his prosthetic knee. Compl. ¶ 32; Ans. ¶ 32; R. Kelly Dep. (Ex. A) 99:18-101:2; S. Kelly Dep. (Ex. G) 103:24-104:6.

18.     On November 6, 2017, Dr. Kindsfater reimplanted Mr. Kelly's prosthetic knee. Compl. ¶ 33; Ans. ¶ 33; R. Kelly Dep. (Ex. A) 101:3-13; S. Kelly Dep. (Ex. G) 103:24-104:6.

19.     Mr. Kelly had the following INR results on the following dates: 1.0 on June 20, 2017, USA NCMC 000936 (Ex. H); 1.1 on June 21, 2017, USA NCMC 000936 (Ex. H); 1.3 on June 23, 2017, USA SUNRISE 000040-000041 (Ex. E); 1.6 on June 26, 2017, USA SUNRISE 000042-000046 (Ex. E); 1.8 on June 28, 2017, USA SUNRISE 000053-000054 (Ex. E); 1.8 on June 30, 2017, USA SUNRISE 000055-000056 (Ex. E); 3.7 on July 7, 2017, USA SUNRISE 000062-000063 (Ex. E); 2.8 on July 10, 2017, USA SUNRISE 000064-000065 (Ex. E); 2.2 on July 11, 2017, USA NCMC 001359 (Ex. H); 2.0 on July 12, 2017, USA NCMC 001359 (Ex. H); 2.3 on July 13, 2017, USA NCMC 001359 (Ex. H); 3.8 on July 14, 2017, USA SUNRISE 000066-000067 (Ex. E); 7.7 on July 16, 2017, USA SUNRISE 000068-000081 (Ex. E). *See also* Trujillo Rpt. (Ex. B) at 6-7 (reviewing records).

20.     "Plaintiffs' F.R.C.P. 26(a)(2) Expert Disclosures" (Ex. O) ("Plaintiff's Initial Disclosures") attached: (1) as Exs. A-B thereto, a document entitled "William Eng Lee, M.D." and Dr. Lee's CV (together, Ex. P hereto); (2) as Ex. H thereto, a document signed by Dr. Sanderford entitled "Kelly Sanderford, M.D., Statement" (Ex. R hereto); and (3) as Ex. I thereto, a document signed by Dr. Sides entitled "Statement regarding Ronald Kelly (Ex. Q hereto). These are the only experts designated by Plaintiffs to opine: (1) in Dr. Lee's case, that the

Sunrise providers "failed to appropriately manage Plaintiff Ronald Kelly's bridge therapy" following his June 20, 2017 and July 11, 2017 surgeries, and (2) in the case of all three experts, that such alleged misconduct caused Mr. Kelly to suffer "abnormal and excessive bleeding and a failure of his surgical wound to heal."  *See generally* Pls.' Init. Disc. (Ex. O).

21.     A clinic note by PA Meryn Harwood stating "Needs to D/C Warfarin once at therapeutic range" and "Continue Warfarin until therapeutic," USA SUNRISE 000042-000046 (Ex. E), was recognized by the Sunrise providers to be a typographical error and did not have an impact on Mr. Kelly's care.  Davis Dep. (Ex. D) 56:16-57:25, 93:3-94:1; Filipovitz Dep. (Ex. L) 62:3-63:2; Lee Dep. (Ex. C) 81:17-83:2.

22.     Dr. Lee's report (Ex. P) and Dr. Sides' Statement (Ex. Q) do not offer opinions on what necessitated Mr. Kelly's July 19, 2017, October 21, 2017, and November 6, 2017 surgeries.

23.     Dr. Sides testified that "Mr. Kelly's infection was what caused him to need subsequent knee surgeries," and absent infection, Dr. Sides' July 11, 2017 "debridement irrigation, hematoma evacuation, and subsequent polyethylene exchange probably would have been sufficient to manage his case and he probably would have healed uneventfully."  Sides Dep. (Ex. F) 42:14-43:9.

24.     Dr. Sanderford testified that based on Mr. Kelly's infection, "the chances of a cure at that point without doing a two-stage revision," involving explanting and reimplanting Mr. Kelly's knee hardware, "would have been very slim."  Sanderford Dep. (Ex. J) 57:6-15.

25.     The expert reports and "Statements" of Drs. Lee, Sanderford, and Sides were drafted by Plaintiffs' counsel.  Lee Dep. (Ex. C) 53:10-54:5; Sanderford Dep. (Ex. J) 32:8-33:10; Sides Dep. (Ex. F) 18:17-19:15.

26.     Prior to their depositions, Drs. Lee, Sanderford, and Sides were not aware that Mr.

Kelly had experienced profuse bleeding from his knee while still at the hospital the day of his initial knee replacement surgery.  Lee Dep. (Ex. C) 159:11-25; Sanderford Dep. (Ex. J) 37:8-38:7; Sides Dep. (Ex. F) 19:23-20:10.

27.     Drs. Sanderford and Sides have not reviewed Mr. Kelly's medical records from Sunrise.  Sanderford Dep. (Ex. J) 8:16-21, 38:14-39:7; Sides Dep. (Ex. F) 7:9-14, 19:16-18.  Dr. Lee has not reviewed any of Mr. Kelly's medical records.  Lee Dep. (Ex. C) 49:22-52:18.

28.     Dr. Lee has not identified publications or guidance supporting his opinion that therapeutic INR results should be shown for "two consecutive days."  Lee Dep. (Ex. C) 79:25-81:5.

29.     Dr. Lee has not identified specific Coumadin or Lovenox dosage adjustments that he believes the Sunrise providers should have implemented for Mr. Kelly.  When asked at his deposition if he thought the Sunrise providers' "milligram level dosage adjustment[s]" for Coumadin violated the standard of care, he confirmed "[n]o, I don't think so."   Lee Dep. (Ex. C) 107:23-109:13.

30.     Dr. Lee has worked at his practice, Northern Hematology-Oncology, since 1997, which began as his own practice and has had only two physicians since 2000.  Lee Dep. (Ex. C) 28:8-29:11.

31.     Dr. Lee has not published anything in the past ten years, and has never published "any material related to warfarin or Lovenox."  Lee Dep. (Ex. C) 36:7-37:6.

32.     Dr. Lee believes that Mr. Kelly's "wound, surgery, [and] infections" "all played a role" in his bleeding during the period of care at issue.  Lee Dep. (Ex. C) 160:23-164:1.

33.     Drs. Sanderford and Sides did not aspirate Mr. Kelly's knee to take cultures or order bloodwork to screen for infection during Mr. Kelly's July 5, 2017 and July 10, 2017 office

visits.  Sides Dep. (Ex. F) 13:16-14:21; Sanderford Dep. (Ex. J) 25:1-6.

34.    Dr. Sides did not give consideration to whether there might be "any other causes" of Mr. Kelly's bleeding, including antibiotics.  Sides Dep. (Ex. F) 25:1-26:14.

## STANDARD OF REVIEW

Under Rule 56(a), summary judgment is appropriate if the pleadings, discovery, any affidavits, and disclosures on file show "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  An issue is genuine if the evidence is such that a reasonable jury could find in favor of the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The initial burden is on the movant to show the absence of a genuine issue of material fact.  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998).  If the movant carries that initial burden of making a *prima facie* showing of a lack of evidence, the burden shifts to the nonmovant to put forth sufficient evidence for each essential element of his claim.  *See Anderson*, 477 U.S. at 248.

## ARGUMENT

In order to prevail on their FTCA claims,[4] Plaintiffs must establish all of the elements of negligence under Colorado law:[5] that (1) a duty was owed to Mr. Kelly by Defendant (or, in this case, its named employees at Sunrise); (2) the Sunrise employees breached that duty; (3) there was an injury to Mr. Kelly; and (4) there was a proximate cause relationship between the breach

---

[4] A derivative loss of consortium claim such as Mrs. Kelly's "'is destroyed'" under Colorado law if her spouse's underlying personal injury claim is unsuccessful on the merits.  *Miller v. Krahl*, No. 11-cv-02331-KMT, 2013 WL 511920, at *3 (D. Colo. Feb. 12, 2012) (quoting *Kinsella v. Farmers Ins. Exchange,* 826 P.2d 433, 435 (Colo. App. 1992)).
[5] Plaintiffs' claims are brought under the FTCA.  Compl. ¶ 4.  That statute provides for the liability of the United States in certain circumstances if a private person "would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b)(1).  The care at issue in this case occurred in Colorado.  Compl. ¶ 5; Ans. ¶ 5.

and the injury.  *Wegner v. Dahlquist*, No. 14-CV-01623-PAB-NYW, 2015 WL 4197081, at *3

(D. Colo. July 13, 2015) (citing *Casebolt v. Cowan*, 829 P.2d 352, 356 (Colo. 1992) (*en banc*)).

Because they cannot establish the requisite elements of such a *prima facie* claim on the record

evidence, summary judgment is warranted in favor of Defendant.

> ### I.      If the Court excludes Plaintiffs' expert opinions, summary judgment is warranted as to their entire claim.

Under Colorado law, the elements of standard of care, breach, and causation in this

medical malpractice case must be proven through expert testimony.  *See Miller*, 2013 WL

511920, at *2 (because "the subject matter of negligent conduct by a medical professional is not

within the ambit of common knowledge and experience of ordinary people, 'the plaintiff must

establish by expert testimony the controlling standard of care,'" as well as "'defendant's failure

to adhere to that standard'") (quoting *Teiken v. Reynolds,* 904 P.2d 1387, 1389 (Colo. App.

1995)); *Mathison v. United States*, 619 F. App'x 691, 694 (10th Cir. 2015) (collecting cases and

explaining that expert testimony is necessary "when proof of causation requires answering

technical questions which are beyond the discernment capacity of laypersons," including in

medical cases).

Accordingly, in the absence of admissible expert testimony from Plaintiffs supporting the

elements of standard of care, breach, and causation, Defendant is "entitled to judgment as a

matter of law."  *Solorio*, 85 F. App'x at 709, 711 (affirming orders excluding neurologist

testimony relevant to causation and granting summary judgment for defendant, given that

negligence plaintiff could not prevail "without his testimony"); *see also, e.g.*, *Taber v. Allied

Waste Sys., Inc.*, 642 F. App'x 801, 812 (10th Cir. 2016) (affirming decisions to exclude expert's

testimony as "unreliable based on his failure to test his theory or to eliminate other possible

causes" and then grant summary judgment because plaintiffs could "establish causation only

through expert testimony"); *Nash v. Wal-Mart Stores, Inc.*, No. 15-CV-02330-RM-MEH, 2017 WL 5188339, at *10 (D. Colo. Feb. 15, 2017) (after excluding plaintiff's expert testimony "discussing the purported cause" of injury, finding plaintiff's "other evidence currently before the Court [] wholly insufficient from which a jury could reasonably infer causation" and granting summary judgment), *aff'd*, 709 F. App'x 509 (10th Cir. 2017).

Defendant's *Daubert* Motion explains why several portions of Plaintiff's expert witness testimony are inadmissible under Federal Rule of Evidence 702:

- First, the Court should rule inadmissible: (1) the unsupported and nonspecific opinions of Dr. Lee, Plaintiffs' sole standard of care expert, that the Sunrise providers breached the standard of care (a) by failing to conduct INR tests for Mr. Kelly "daily on post-operative days 4 through 10" and otherwise until therapeutic INR results were shown for "two consecutive days," and (b) by failing to make unspecified anticoagulant dose adjustments. Those opinions are not supported by sufficient facts and do not reflect the reliable application of scientific principles, particularly in light of Dr. Lee's failure to review key medical records and deposition testimony, his inability to identify valid supporting literature or studies, and the absence of meaningful peer review or testing. *See* Def.'s *Daubert* Mot. at 18-22; Statement of Undisputed Material Facts ("SMF") ¶¶ 25-31.

- Second, the Court should rule inadmissible the opinions of Dr. Lee, Dr. Sanderford, and Dr. Sides that the Sunrise providers caused Mr. Kelly injuries, specifically that their alleged omissions in regard to his anticoagulation treatment caused him to suffer abnormal and excessive bleeding and subsequent poor wound healing. These opinions likewise are not supported by sufficient facts, discount contradictory record evidence without explanation, fail to perform meaningful differential diagnoses, and are not premised on reliable validation, including

through reference to testing that was available and simply not pursued at the time of Mr. Kelly's care. *See* Def.'s *Daubert* Mot. at 22-29; SMF ¶¶ 25-27, 30-34.

- Third, even if it finds such testimony admissible as a matter of evidence under Rule 702, the Court should strike or exclude the Sanderford and Sides Statements for failure to comply with Federal Rule of Civil Procedure 26(a)(2). *See* Def.'s *Daubert* Mot. at 31-39.

Dr. Lee is the only one of Plaintiffs' experts designated to opine on breach and standard of care—that the Sunrise providers allegedly "failed to appropriately manage Plaintiff Ronald Kelly's bridge therapy" following his June 20, 2017 and July 11, 2017 surgeries. Compl. ¶¶ 26, 29. And Drs. Lee, Sanderford, and Sides are the only experts designated to opine on causation—that such alleged misconduct caused Mr. Kelly to suffer the fundamental injury of "abnormal and excessive bleeding and a failure of his surgical wound to heal," *id.* ¶¶ 26, 29, which Plaintiffs believe in turn necessitated his subsequent surgeries in combination with infection, *id.* ¶¶ 31-33. If the Court grants Defendant's *Daubert* Motion and excludes and/or strikes those opinions, Plaintiffs will lack the necessary expert witness testimony to establish the standard of care, breach, or causation elements of their negligence claim, and summary judgment is warranted.

As another court explained in a decision granting a defendant's motion to exclude expert testimony under Federal Rule of Evidence 702 and granting summary judgment because the plaintiff thus could not "sustain her burden as the non-mving party under Rule 56":

> If summary judgment can be avoided merely by presenting the unsupported opinion of an expert witness, it would be virtually impossible for a court to grant summary judgment as long as the non-moving party could locate a sole expert who was willing to create a genuine issue of material fact for a price.

*Squires ex rel. Squires v. Goodwin*, 829 F. Supp. 2d 1041, 1060–61 (D. Colo. 2011). That consideration should be of paramount importance here, where Plaintiffs' expert opinions involve not merely lack of support but unavoidable self-interest on the part of Dr. Sanderford and Dr.

**II.   Even if the Court admits and credits all of Plaintiffs' expert testimony, it should grant summary judgment dismissing portions of Plaintiffs' negligence claim.**

In addition, summary judgment is appropriate on other grounds as to three discrete portions of Plaintiffs' negligence claim: any allegation that the Sunrise providers failed to make "appropriate and timely" adjustments to Mr. Kelly's Coumadin; that the Sunrise providers' alleged negligence *caused* the need for his July 19, 2017, October 21, 2017, and November 6, 2017 surgeries; and that PA Harwood's accused clinic note was "negligent."

**a.   There is no evidence to support a claim regarding Coumadin dosing.**

Both Plaintiffs[6] and their expert appear to have abandoned any contention that the Sunrise providers failed to prescribe appropriate doses of Coumadin.

Dr. Lee's expert report initially asserted that the Sunrise providers did not make appropriate and timely dose adjustments to Mr. Kelly's anticoagulants.  However, when asked at his deposition if he thought the Sunrise providers' "milligram level dosage adjustment[s]" for Coumadin violated the standard of care, Dr. Lee confirmed "[n]o, I don't think so."  SMF ¶ 29. Plaintiffs cannot point to other expert testimony that would support a negligence claim involving Coumadin dosing.  Summary judgment against any such claim is warranted in the absence of facts on which a reasonable factfinder could find for Plaintiffs.  *See Anderson*, 477 U.S. at 248.

**b.   There is no evidence to support a claim that the Sunrise providers caused the need for Mr. Kelly's third through fifth knee surgeries.**

The opinions of Plaintiffs' experts—even if they were assumed to be admissible and correct—still would not create a genuine issue of material fact to support a claim that the conduct

---

[6] A discussion during Dr. Filipovitz's deposition appeared to clarify Plaintiffs' apparent misunderstanding of certain Sunrise medical records related to Coumadin dose adjustments.  *See* Filipovitz Dep. (Ex. L) 92:21-94:23 (explaining records).

of the Sunrise providers caused Mr. Kelly to require his third through fifth knee surgeries, which were performed by Dr. Sanderford on July 19, 2017; by Dr. Kindsfater on October 21, 2017; and on November 6, 2017.  SMF ¶¶ 16-18.

Plaintiffs allege that these corrective surgeries were necessary "[d]ue to" Mr. Kelly's "excessive bleeding, failure to heal, and infection."  Compl. ¶¶ 31-33.  Setting aside for the moment Plaintiffs' experts' challenged opinions on the causes of Mr. Kelly's "excessive bleeding," the downstream causation issue of what necessitated his corrective surgeries— whether it was bleeding, infection, or something else altogether—involves "technical questions which are beyond the discernment capacity of laypersons," and therefore requires proof through expert testimony.  *Mathison*, 619 F. App'x at 694.

Plaintiffs have not produced expert opinions answering those questions.  The reports of Dr. Lee (Ex. P) and Dr. Sides (Ex. Q) do not offer opinions on what necessitated Mr. Kelly's July 19, 2017, October 21, 2017, and November 6, 2017 surgeries.  SMF ¶¶ 22.  Dr. Sides' deposition testimony is actually contrary to Plaintiffs' position.  He testified that, regardless of the bleeding he had experienced, "Mr. Kelly's infection was what caused him to need subsequent knee surgeries," and absent infection, "I think my debridement irrigation, hematoma evacuation, and subsequent polyethylene exchange probably would have been sufficient to manage his case and he probably would have healed uneventfully."  SMF ¶ 23.

Only two other portions of Plaintiffs' expert disclosures address the causes of Mr. Kelly's third through fifth knee surgeries, neither of which is sufficient to defeat summary judgment. First, Dr. Sanderford's Statement (Ex. R) states in one paragraph that "Ronald Kelly suffered persistent, abnormal, and excessive bleeding.  This necessitated both Dr. Sides' surgery on July 11, 2017 and my second surgery on July 19, 2017.  It also resulted in my referral of Mr. Kelly to

Dr. Kindsfater and two subsequent surgeries by Dr. Kindsfater."  But that conclusory statement,[7]

unsupported by any factual basis and entirely speculative as to surgeries performed by another

provider, is not competent summary judgment evidence.  *Bones v. Honeywell Int'l, Inc.*, 366

F.3d 869, 875 (10th Cir. 2004) (conclusory statements based merely on conjecture, speculation,

or subjective belief are not competent summary judgment evidence); *see also J. Lee Browning*

*Belize Tr. v. Lynton*, No. 16-cv-02078-NYW, 2019 WL 176825, at *2 (D. Colo. Jan. 11, 2019)

(non-movant may not "rely on mere reargument of his case or a denial of an opponent's

allegation") (internal quotation marks and citation omitted).

Second, the same can be said of the one other line of Plaintiffs' expert disclosures of any

possible relevance: Dr. Kindsfater "is expected to testify that he believes that his surgeries [of

October 21, 2017, and November 6, 2017] were ultimately necessitated due to abnormal and

excessive bleeding that Mr. Kelly experienced following the initial knee surgery on June 20,

2017."  Pls.' Init. Disc. (Ex. O) at 10.  It is not clear that this unsigned sentence rises to the level

of an expert opinion at all.  If so, it also is impermissibly conclusory and unhelpful to any

rational factfinder.

Notably, to succeed on their negligence claim, Plaintiffs must prove proximate causation.

*See Ayala v. United States*, 846 F. Supp. 1431, 1441 (D. Colo. 1993) ("Colorado law provides

that a negligent party is liable for his or her negligence only if that negligence was the proximate

cause of the plaintiff's injury." (citation omitted)), *aff'd,* 49 F.3d 607 (10th Cir. 1995).  Even if

the Court were to accept all of Plaintiffs' expert evidence at face value, none of it clearly

addresses the undisputed evidence of other events that had a "predominant effect" making the

---

[7] It also is contradicted by Dr. Sanderford's deposition testimony that it was due to Mr. Kelly's
infection that "the chances of a cure at that point without doing a two-stage revision," explanting
and then reimplanting Mr. Kelly's knee hardware, "would have been very slim."  SMF ¶ 24.

Sunrise providers' alleged negligence "insignificant" to his need for corrective surgeries. *Smith*

*v. State Compensation Ins. Fund*, 749 P.2d 462, 464 (1987) (citation omitted).

Here, for example, it is undisputed that Mr. Kelly's surgical wound was "open" weeks

after his initial surgery, SMF ¶¶ 9-10; that bacterial cultures taken at his July 11, 2017 surgery

revealed numerous infections with *e. coli* and two *staphylococcus* organisms, SMF ¶ 12; and that

he was given antibiotics between July 5, 2017-July 15, 2017 (by providers outside Sunrise) that

are known to increase risks of bleeding, SMF ¶¶ 5, 13, 14. A prosthetic joint infection like Mr.

Kelly's also can cause increased bleeding and compromised wound healing, SMF ¶ 15, and Dr.

Sides has opined that it in fact is what "caused him to need subsequent knee surgeries" here,

SMF ¶ 23.

In the absence of competent expert testimony to establish that the Sunrise providers'

alleged negligence necessitated Mr. Kelly's third through fifth knee surgeries—which is required

here, *see Mathison*, 619 F. App'x at 694—the Court should grant summary judgment.

### c. There is no evidence to support a claim regarding typographical errors in PA Harwood's clinic note.

Similar to the first partial summary judgment issue above, Plaintiffs have put forth no

genuine expert or other evidence to support a claim for negligence premised on PA Harwood's

typographical error, which was only briefly addressed by Dr. Lee.

Dr. Lee's report states that "on June 26, 2017 Mr. Kelly was seen at SCH by Meryn

Harwood, PA. Dr. Lee will identify Ms. Harwood's clinic notes, which state, 'Needs to D/C

Warfarin once at therapeutic range' and 'Continue Warfarin until therapeutic' . . . Dr. Lee will

testify that this clinic note by Ms. Harwood was negligent and below the standards of care for

Physician Assistants under similar circumstances." Lee Rpt. (Ex. P) at 5. However, all of the

depositions confirmed that the referenced note by PA Harwood was interpreted by the Sunrise

physicians as a typographical error, which did not have any actual impact on Mr. Kelly's care. SMF ¶ 21.  Even if Dr. Lee truly believes that such a typographical error constitutes a breach of the standard of care, proof that such breach had a "proximate cause relationship" to some injury to the Kellys also is required to prove negligence.  *Ayala*, 846 F. Supp. at 1441.  Because there is no genuine dispute in that regard, summary judgment again is appropriate.  Fed. R. Civ. P. 56(a).

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court grant summary judgment in its favor and dismiss the case.

DATED at Denver, Colorado this 24th day of March, 2021.

MATTHEW T. KIRSCH
Acting United States Attorney

*s/ Elizabeth Hagerty*
Elizabeth Hagerty
Assistant United States Attorney
United States Attorney's Office
1801 California Street, Ste. 1600
Denver, CO 80202
Tel. (303) 454-0101
Fax (303) 454-0411
elizabeth.hagerty@usdoj.gov

*Counsel for Defendant*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 24, 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following e-mail addresses:

john@jomlegal.com

*s/ Elizabeth Hagerty*
Elizabeth Hagerty
Assistant United States Attorney

*Counsel for Defendant*